**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACOB THUNDATHIL, derivatively on behalf of KINGOLD JEWELRY, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>ZHIHONG JIA, BIN LIU, JUN WANG, GUANG CHEN, ALICE IO WAI WU, and ZHIYONG XIA,<br><br>        Defendants,<br><br>    and<br><br>KINGOLD JEWELRY, INC.,<br><br>        Nominal Defendant. | Case No. 1:20-cv-04182<br><br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Jacob Thundathil ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Kingold Jewelry, Inc. ("Kingold" or "the Company"), files this Verified Shareholder Derivative Complaint against Defendants Zhihong Jia, Bin Liu, Jun Wang, Guang Chen, Alice Io Wai Wu, and Zhiyong Xia (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Kingold, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among

other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kingold, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Kingold's directors and officers beginning on March 15, 2018 and continuing through the present (the "Relevant Period").

2.      Kingold is incorporated in Delaware, and has operational headquarters in Wuhan, Hubei Province, in the People's Republic of China (the "PRC"). Kingold purports to be a designer and manufacturer of high-quality gold jewelry and other gold items, which are primarily sold within the PRC. In addition to selling its own branded products, the Company designs and produces certain items for other brands.

3.      Kingold's stock was listed on the Nasdaq Capital Market ("NASDAQ") from August 2010 through August 2020 under the ticker symbol "KGJI."[1] Prior to August 18, 2010, the Company's stock was listed on the OTC Bulletin Board under the same symbol.

---

[1] The Company effectuated a one-for-six reverse stock split in October 2019. The prices per share cited throughout this Complaint account for the stock split by listing the price as if the stock split had already occurred prior to the date it was effected, in conformity with both the Company and the NASDAQ's historic price quotes. This accounting is to accurately reflect the diminution in value of equity stakes purchased before the reverse stock split.

4.     Kingold was a member of the Shanghai Gold Exchange from 2003 through June 2020, and obtained all its purchased gold through the Shanghai Gold Exchange, the only legal provider of gold in China.

5.     Historically, the Company's business was centered on the production of gold jewelry from raw materials. According to the Company's SEC filings, beginning in 2016, the Individual Defendants began expanding the Company's business operations by investing in gold as a commodity.

6.     To accomplish this, the Individual Defendants obtained a series of loans from a variety of Chinese lenders, including, *inter alia*, Anxin Trust ("Anxin"), Chang'An Trust ("Chang'An"), Dongguan Trust ("Dongguan"), Evergrowing Bank Yantai branch ("Evergrowing," also known as Hengfeng Bank, the transliteration of the Chinese name), China Minsheng Trust ("Minsheng"), and Sichuan Trust (collectively, the "Creditors" or the "Lenders"). In general, the Individual Defendants used the money to purchase gold from the Shanghai Gold Exchange, and this gold was then transported to the Creditors' facilities to be stored as security for the loans.

7.     Unbeknownst to the Creditors and the investing public, however, the gold that the Individual Defendants had used to secure the Company's loans was not gold at all, but rather copper bars coated in a thin layer of gold (generally, the "Counterfeit Collateral Scheme"). Because these loans were secured fraudulently, the Individual Defendants' statements throughout the Relevant Period with regard to the Company's asset holdings and loans were materially false and misleading at all relevant times.

8.     The Counterfeit Collateral Scheme went undetected until 2019, when the Company defaulted on several of its secured loans, and the Creditors seized the gold collateral to liquidate it

and recoup the value of the loans. At this time, the Creditors discovered that the collateral was merely gilded copper bars, not the AU9999 gold that they thought they were holding.

9.       These revelations became public in a news article published on June 29, 2020 by Chinese investigative journalism outlet Caixin Global, titled, "The Mystery of $2 Billion of Loans Backed by Fake Gold" (the "Caixin Article").[2]

10.      In the Caixin Article, it was disclosed that:

More than a dozen Chinese financial institutions, mainly trust companies, loaned 20 billion yuan ($2.8 billion) over the past five years to **Wuhan Kingold Jewelry Inc.** with pure gold as collateral and insurance policies to cover any losses.

What could go wrong?

Well, plenty, as at least some of 83 tons of gold bars used as loan collateral turned out to be nothing but gilded copper. That has left lenders holding the bag for the remaining 16 billion yuan of loans outstanding against the bogus bars. The loans were covered by 30 billion yuan of property insurance policies issued by state insurer PICC Property and Casualty Co. Ltd. (PICC P&C) and other smaller insurers.

11.      The Caixin Article also described the multi-year nature of the Counterfeit Collateral Scheme and its increasing scale, stating:

Since 2015, Kingold has increased its reliance on gold-backed borrowing and started working with PICC P&C to cover the loans. In 2016, Kingold borrowed 11 billion yuan, nearly 16 times higher than the previous year's figure. Its debt-to asset ratio surged to 87.5% from 43.4%, according to a company financial report. That year, Kingold pledged 54.7 tons of gold for loans, 7.5 times higher than the previous year.

12.      The Caixin article also alluded to litigation that had arisen from the Counterfeit Collateral Scheme: namely, suits against the Company's insurer, PICC P&C ("PICC," or the "Insurer") brought by Minsheng, Dongguan, and Chang'An.

---

[2]       https://www.caixinglobal.com/2020-06-29/cover-story-the-mystery-of-2-billion-of-loans-backed-by-fake-gold-101572911.html (last visited July 27, 2020).

13.     The Caixin Article was released before the market opened on June 29, 2020. By the end of that day, the price of the Company's stock had fallen to close at $0.85 per share, a loss of $0.27 or over 24% from the previous trading day's close.

14.     Subsequently, and as a result of Individual Defendants' misconduct, the Company has been subjected to additional lawsuits naming the Company as a defendant brought by Lenders defrauded by the Counterfeit Collateral Scheme.

15.     On August 11, 2020, the Company notified NASDAQ authorities of the Company's intention to voluntarily delist its common stock from NASDAQ. Such delisting ultimately became effective on August 31, 2020, and the Company's stock began trading on the OTC.

16.     On August 15, 2020, Friedman LLP ("Friedman"), the Company's independent auditor, sent Kingold a letter indicating that the firm had terminated its relationship with the Company, effective immediately. In its resignation letter, Friedman indicated that it had become aware of material, undisclosed information that should have been included in Kingold's financial statements for the fiscal years ended December 31, 2016, 2017, and 2018, and that the firm had been "unable to conduct a satisfactory investigation of the information" due to the Individual Defendants' unwillingness to cooperate with Friedman. Friedman further asserted that its prior audits of the Company's financial statements for those fiscal years should therefore no longer be relied upon.

17.     The Company has also failed to timely file certain of its periodic and annual reports, as required by applicable SEC rules, including its annual report on form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K") and its quarterly report on Form 10-Q for the first quarter of fiscal 2020 (the "1Q20 10-Q"). As of the date of the filing of this complaint, the Company has yet to file the 2019 10-K or the 1Q20 10-Q.

18.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by engaging in the Counterfeit Collateral Scheme, and by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*, that (1) the Individual Defendants improperly engaged in the Counterfeit Collateral Scheme to represent gilded copper alloy bars as genuine gold and thereby fraudulently obtain loans; (2) due to the Company's purported gold being gilded copper bars, the value of the gold assets reported in the Company's financial statements was fraudulently inflated; (3) the Company had been engaged in litigation with various Creditors since at least 2019; (4) due to the foregoing, the Company would foreseeably be subjected to various regulatory consequences, including delisting from the Shanghai Gold Exchange and an investigation by the PRC; and (5) the Company failed to maintain both its internal operational and financial controls. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.

19.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

20.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls and caused the Company to fail to timely file the 1Q20 10-Q and the 2019 10-K with the SEC.

21.     In light of the Individual Defendants' misconduct, which has subjected Kingold, its Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO") to being named

as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Eastern District of New York (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

22.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's liability in the Securities Class Actions, and of their not being disinterested or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, and 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

<div align="center">**PARTIES**</div>

**Plaintiff**

28.     Plaintiff is a current shareholder of Kingold common stock. Plaintiff has continuously held Kingold common stock since the beginning of the Relevant Period.

**Nominal Defendant Kingold**

29.     Nominal Defendant Kingold is a Delaware corporation with its principal executive offices at No. 8 Han Huang Road, Jiang'an District, Wuhan, Hubei Province, PRC, 430023. Kingold stock trades on the OTC under the ticker symbol "KGJI."

**Defendant Zhihong Jia**

30.     Defendant Zhihong Jia ("Jia") is the Company's founder, and has served as the Company's CEO and Chairman of the Board since 2009. According to the Company's Schedule 14A filed with the SEC on November 18, 2019 (the "2019 Proxy Statement"), as of November 14, 2019, Defendant Jia beneficially owned 2,809,324 shares of the Company's common stock, which represented approximately 25.5% of the Company's outstanding stock as of that date, making Defendant Jia a majority shareholder. Given that the price per share of the Company's common

stock at the close of trading on November 14, 2019 was $1.53, Defendant Jia beneficially owned $4,298,265 worth of Kingold stock.

31.     Defendant Jia personally guaranteed loans totaling over $1.402 billion[3] which named the Company as a borrower. The Company's current report on Form 8-K filed with the SEC on July 6, 2020 (the "July 6, 2020 8-K") indicates that at least $1.177 billion[4] of those loans remained unpaid as of July 6, 2020.

32.     For the fiscal year ended December 31, 2018, Defendant Jia received $175,000 in compensation from the Company in the form of salary.

33.     The Company's 2019 Proxy Statement stated the following about Defendant Jia:

Mr. Jia has served as our Chief Executive Officer and Chairman of our Board since the consummation of our December 2009 reverse acquisition transaction. Mr. Jia also co-founded Wuhan Kingold Jewelry Company Limited ("Wuhan Kingold"), our contractually controlled affiliate and has served as its Chief Executive Officer and Chairman since its establishment in 2002. Mr. Jia has also served vice president of the Gems and Jewelry Trade Association of China since November 2005. Mr. Jia served in the rear supply service department of the People's Liberation Army in Guangzhou and Wuhan, and was responsible for managing gold mines owned by the Army. Mr. Jia graduated from Wuhan University in 2004 with a graduate EMBA certificate.

Mr. Jia brings extensive operational and industry experience to our company. Furthermore, Mr. Jia's committed service as our Chairman and Chief Executive Officer, along with his knowledge of and deep genuine interest in our company and industry led the Board to conclude that he should be nominated to serve another term as a director.

**Defendant Liu**

34.     Defendant Bin Liu ("Liu") served as the Company's CFO from April 2010 until he resigned on June 1, 2020. According to the Company's 2019 Proxy Statement, as of November 14, 2019, Defendant Liu beneficially owned 138,384 shares of the Company's common stock.

---

[3] This figure is taken from the Company's Current Report on Form 8-K filed on July 6, 2020. It is the sum of the amounts borrowed reported for the loans detailed therein, which were the loans for which Wuhan Kingold was in default.
[4] The 8-K reported the loan amount in both RMB and USD equivalent, but reported the amount outstanding only in RMB. The amount outstanding is approximated at a rate of 1 RMB:0.14 USD, the exchange rate at time of writing.

Given that the price per share of the Company's common stock at the close of trading on November 14, 2019 was $1.53, Defendant Liu beneficially owned $211,651 worth of Kingold stock.

35.     For the fiscal year ended December 31, 2018, Defendant Liu received $135,000 in compensation from the Company in the form of salary.

36.     The Company's 2019 Proxy Statement stated the following about Defendant Liu:

Mr. Liu has served as our Chief Financial Officer since April 2010. Mr. Liu has more than 20 years of experience in the financial markets and in bridging business between the U.S. and China. From July 2004 through March 2010, Mr. Liu served as a vice president of Citigroup's Financial Institution Cards business where he had full financial responsibility of a $2 billion business. He has also played critical roles in the development of Citigroup's franchise development in the U.S. From 1993 through 2002, Mr. Liu worked for the China's Ministry of Commerce (MOFCOM), promoting bilateral business and investment between the U.S. and China. Mr. Liu graduated from Shanghai Institute of Foreign Trade with a Bachelor's Degree in International Business in 1993 and graduated from the Kellogg School at Northwestern University with a Master of Business Administration in 2004.

**Defendant Wang**

37.     Defendant Jun Wang ("Wang") has served as a Company director and as the Company's General Manager since 2014. According to the Company's 2019 Proxy Statement, as of November 14, 2019, Defendant Wang beneficially owned 63,351 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 14, 2019 was $1.53, Defendant Wang beneficially owned $96,927 worth of Kingold stock.

38.     For the fiscal year ended December 31, 2018, Defendant Wang received $22,355 in compensation from the Company for his role as General Manager, and was not compensated for his role as a Company director.

39.     The Company's 2019 Proxy Statement stated the following about Defendant Wang:

Mr. Wang has served as one of our directors since June 16, 2014 and as our general manager since May 1, 2014. Mr. Wang has worked at Wuhan Kingold since 2003

10

as a gold investment analyst, and has successively served as the manager of the purchase department, the manager of the investment department, the assistant general manager and as the vice general manager of Wuhan Kingold. From 2000 to 2002, Mr. Wang worked at Hubei Mailyard Group Company and led its network information management and website development. From 1997 to 2000, Mr. Wang worked at MODISH C'BONS Cosmetics Company and led its network information management and logistics management. Mr. Wang graduated with a Bachelor's Degree from the Computer Engineering Department of Central China Normal University in 1997 where he majored in software development and application. Mr. Wang was elected to the Board due to his 14 years of working experience both within the gold jewelry industry and at Wuhan Kingold, his experience and involvement with the company, as well as his deep understanding of the gold jewelry industry and abundant experience in the management of industrial production technology and business management.

**Defendant Chen**

40.     Defendant Guang Chen ("Chen") has served as a Company director since June 2014. He serves as the Chair of the Company's Nominating Committee, and as a member of the Audit Committee and the Compensation Committee. According to the July 6, 2020 8-K, Defendant Chen is a member of a special committee formed to oversee an internal investigation into claims raised in the Caixin Article.

41.     For the fiscal year ended December 31, 2018, Defendant Chen received $17,884 in compensation from the Company in the form of fees earned or paid in cash.

42.     The Company's 2019 Proxy Statement stated the following about Defendant Chen:

Mr. Chen has served as one of our directors since June 16, 2014. Mr. Chen has severed as chairman of the Nominating Committee and a member of the Audit Committee and the Compensation Committee. Mr. Chen has extensive banking experience as well as experience with public companies and in capital markets within China. Mr. Chen has worked as a Vice President at the Investment Bank Department of HuaTai United Securities Co., Ltd. since June 2015. He worked at China Merchants Securities Co., Ltd. Investment Bank since 2007 to 2015. From 2007 to 2009, Mr. Chen worked in the Supervision Department of the China Securities Regulatory Commission. From 2006 to 2007, Mr. Chen worked in the Supervision Department of the Tianjin Securities Regulatory Bureau. Mr. Chen graduated from the Xi'an University of Architecture and Technology in 2003, from which he earned a Bachelor's Degree in Accounting. Mr. Chen also holds a

Master's Degree in Economics from Nankai University, from which he graduated in 2006.

**Defendant Wu**

43.     Defendant Alice Io Wai Wu ("Wu") has served as a Company director since 2016. She serves as the Chair of the Company's Audit Committee, and as a member of the Compensation Committee and the Nominating Committee. According to the July 6, 2020 8-K, Defendant Wu is a member of the special committee formed to oversee an internal investigation into claims raised in the Caixin Article.

44.     For the fiscal year ended December 31, 2018, Defendant Wu received $48,000 in compensation from the Company in the form of fees earned or paid in cash.

45.     The Company's 2019 Proxy Statement stated the following about Defendant Wu:

> Ms. Wu has served as one of our directors since May 9, 2016. Ms. Wu has served as chairman of the Audit Committee and a member of the Compensation Committee and Nominating Committee of our Board since May 2016. Ms. Wu has been providing accounting, consulting and advisory services to public and private companies since September 2011 through her company Wu & Company, Inc. Ms. Wu was an independent director of Yulong Eco-materials Limited, a company listing on Nasdaq, from July 2015 to February 2017. From February 2015 to December 2015, she was the chief financial officer of The Future Education Group Inc., a Chinese company providing online and mobile education platforms and contents. Ms. Wu also has had extensive experience auditing the financial statements and internal controls of public and private companies, including as a partner at Anton & Chia, LLP from August 2013 to May 2014, a partner at Cacciamatta Accounting Corporation from January 2009 to July 2013, and as an audit manager of Moore Stephens Wurth Frazer and Torbet, LLP from January 2005 to May 2008. Ms. Wu graduated from California State University, Fullerton, with a bachelor's degree in business administration with accounting concentration.

**Defendant Xia**

46.     Defendant Zhiyong Xia ("Xia") has served as a Company director since August 2016. He serves as the Chair of the Company's Compensation Committee, and as a member of the Audit Committee and the Nominating Committee.

47.     The Company's 2019 Proxy Statement stated the following about Defendant Xia:

Mr. Xia served as one of our directors since August 2016. Mr. Xia served as
chairman of the Compensation Committee and a member of the Audit Committee
and the Nominating Committee of our Board since August 2016. Mr. Xia has been
a partner of Hubei Zhongyou Law Firm since January 2009. Mr. Xia has worked at
Hubei Zhongyou Law Firm since 2003 and has been licensed to practice law since
May 2005. Mr. Xia has been providing legal services to various investment
companies regarding litigation and transactional matters. Mr. Xia graduated from
Wuhan City Construction College (now called Huazhong University of Science and
Technology) in 1991, when he received his bachelor's degree in agriculture.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers, directors and/or fiduciaries of Kingold and

because of their ability to control the business and corporate affairs of Kingold, the Individual

Defendants owed Kingold and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Kingold

in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

act in furtherance of the best interests of Kingold and its shareholders so as to benefit all

shareholders equally.

49.     Each director and officer of the Company owes to Kingold and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in

the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of Kingold, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.

51.     Each Individual Defendant, by virtue of his position as a director and/or officer,

owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith,

and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Kingold, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Kingold's Board at all relevant times.

52. To discharge their duties, the officers and directors of Kingold were required to exercise reasonable and prudent supervision over the management, policies, practices, operations, and internal controls of the Company. By virtue of such duties, the officers and directors of Kingold were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of the United States, and pursuant to Kingold's own Code of Business Conduct and Ethics (the "Code of Ethics") and internal guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Kingold conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Kingold and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Kingold's operations would comply with all laws and Kingold's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.      Each of the Individual Defendants further owed to Kingold and the shareholders the duty of loyalty requiring that each favor Kingold's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Kingold and were at all times acting within the course and scope of such agency.

55.     Because of their advisory, executive, managerial, and directorial positions with Kingold, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Kingold.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's assets, operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, fail to maintain adequate internal controls, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the

actions described herein occurred under the authority and approval of the Board, each of the Individual Defendants who are directors of Kingold was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Kingold, and was at all times acting within the course and scope of such agency.

## KINGOLD'S CODE OF ETHICS

62.     The Company's Code of Ethics "sets forth legal and ethical standards of conduct for [Kingold's] directors, officers, employees, and consultants," and those of "all of its subsidiaries and other business entities controlled by it worldwide." The Code of Ethics further provides that Kingold's officers and directors are required to "comply with all laws, rules and regulations applicable to the Company wherever it does business."

63.     The Code of Ethics provides the following with respect to "Honest and Ethical Conduct and Fair Dealing," in relevant part:

> Employees, consultants, officers and directors should endeavor to deal **_honestly, ethically and fairly_** with the Company's suppliers, customers, competitors and employees. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent. **_You must not take unfair advantage of anyone through_**

*manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.*

(Emphasis added.)

64.      The Code of Ethics provides the following with respect to "Compliance with Laws,

Rules and Regulations," in relevant part:

> *If you become aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, consultants, directors, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor.* If you are unable or do not wish to discuss the matter with your supervisor, contact your department head. If you are unable or do not wish to discuss the matter with your department head, contact an executive officer. If you are unable or do not wish to discuss the matter with an executive officer, contact a member of the board of directors. *While it is the Company's desire to address matters internally, nothing in this Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority.* Employees, officers, consultants and directors shall not discharge, demote, suspend, threaten, harass or in any other manner discriminate or retaliate against an employee or consultant because he or she reports any such violation, unless it is determined that the report was made with knowledge that it was false. *This Code should not be construed to prohibit you from testifying, participating or otherwise assisting in any state or federal administrative, judicial or legislative proceeding or investigation.*

(Emphasis added.)

65.      The Code of Ethics provides the following with respect to "Protection and

Proper Use of Corporate Assets," in relevant part:

> Employees, consultants, officers and directors should seek to protect the Company's assets. *Theft, carelessness and waste have a direct impact on the Company's financial performance.* Employees, consultants, officers and directors must use the Company's assets, supplies and services solely for legitimate business purposes of the Company and not for any personal benefit or the personal benefit of anyone else. Employees, consultants, officers and directors must advance the Company's legitimate interests when the opportunity to do so arises. You must not take for yourself personal opportunities that are discovered through your position with the Company or the use of property or information of the Company.

(Emphasis added.)

66.     The Code of Ethics provides the following with respect to "Accuracy of Books and Records and Public Reports," in relevant part:

> *Employees, consultants, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.*
>
> All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. *The external, published financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies.* No undisclosed or unrecorded account or fund shall be established for any purpose. *No false or misleading entries shall be made in the Company's books or records for any reason,* and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.
>
> *It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure* in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

(Emphasis added.)

67.     The Code of Ethics provides the following with respect to "Dealings with Independent Auditors and Accountants," in relevant part:

> *No employee, consultant, officer or director shall, directly or indirectly, make or cause to be made a materially false or misleading statement to an accountant in connection with (or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to, an accountant in connection with) any audit, review or examination of the Company's financial statements or the preparation or filing of any document or report with the SEC. No employee, consultant, officer or director shall, directly or indirectly, take any action to coerce, manipulate, mislead or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the Company's financial statements.*

(Emphasis added.)

68.     The Code of Ethics provides the following with respect to "Reporting and Compliance Procedures," in relevant part:

*Every employee, consultant, officer and director has the responsibility to ask questions, seek guidance, report suspected violations, and express concerns regarding compliance with this Code.* Any employee, consultant, officer or director who knows or believes that any other employee, consultant or representative of the Company has engaged or is engaging in Company-related conduct that violates applicable law or this Code should report such information to his or her supervisor. If the employee, consultant, officer or director is unable or does not wish to discuss the question with his or her supervisor, he or she should contact his or her department head. If he or she is unable or does not wish to discuss the question with his or her department head, he or she should contact an executive officer. If he or she is unable or does not wish to discuss the question with an executive officer, he or she should contact a member of the board of directors. Any employee, consultant, officer or director may report such conduct openly or anonymously without fear of retaliation. The Company will not discipline, discriminate against or retaliate against any employee or consultant who reports such conduct, unless it is determined that the report was made with knowledge that it was false, or who cooperates in any investigation or inquiry regarding such conduct. *Any supervisor who receives a report of a violation of this Code must immediately inform the Chief Financial Officer.*

(Emphasis added.)

69.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Counterfeit Collateral Scheme or in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT AND MISREPRESENTATIONS

### Background

70.     The entity that is now Kingold was initially incorporated in Delaware in 1995 as Vanguard Enterprises, Inc. In 1999, the Company changed its corporate name to Activeworlds.com, Inc. and then, at an unspecified time, to Activeworlds, Corp. This entity was engaged in the business of internet products and services. In 2002, the internet-related business was sold to its management. Thereafter, the Company functioned as a shell company that laid dormant for several years, with no expenses, assets, liabilities, material business or revenues. In 2009, the Company became an indirect holding company for Wuhan Vogue-Show Jewelry Co., Limited (the "Operating Company") via Dragon Lead Group Limited.

71.     In 2002, Defendant Jia, along with several other individuals, founded Wuhan Kingold Jewelry Co., Limited ("Wuhan Kingold"). In 2003, one co-founder sold her interest in Wuhan Kingold to Defendant Jia and non-party Chen Wei. Presently, Defendant Jia owns 92.48% of Wuhan Kingold, and the remaining 7.42% equity of Wuhan Kingold is owned by three other, unidentified, PRC citizens.

72.     In 2009, the Operating Company entered into a series of agreements with Wuhan Kingold under which 95.83% of Wuhan Kingold shareholders transferred their voting rights and their 95.83% collective share of economic benefits to the Operating Company.  In 2011, the remaining Wuhan Kingold shareholders joined the agreement, giving the Operating Company total control of Wuhan Kingold and the right to all its economic benefits. Additionally, under these agreements, the Operating Company acquired the rights to purchase all the shares of Wuhan Kingold if and when such purchase became legally permissible under PRC laws and regulations before October 20, 2021.

73.     After setting up the indirect holding structure, the Company changed its name to Kingold Jewelry, Inc., its present name.

74.     For much of its history, Kingold's business consisted mainly of producing gold jewelry under its own brand name and for other brands. Starting in 2016, however, the Company began investing in gold as a commodity.

### The Counterfeit Collateral Scheme

75.     In 2016, in connection with the Company's investment activities, the Company began obtaining loans from the Lenders secured by what the Individual Defendants represented to be gold. It is presently unclear whether, at the times the loans were made, the gold transferred to the Lenders' possession as collateral was genuine or counterfeit. The Caixin Article variously quotes one source from a Lender who claimed that the gold was verified by third parties, transferred under supervision from the Lender, the Company, and the Insurer, and had never been accessed until recent testing showed it to be counterfeited; another source is quoted alleging that local lenders would not deal with Kingold because "we knew for years that [Defendant Jia] doesn't have much gold—all he has is copper."

76.     Some of the loans were secured by the Company's leasing gold, which Kingold did not own, from unspecified banks, which was then stored by the Creditors in the same manner as the gold that Kingold owned.

77.     On November 28, 2017, Song Hao, the Chairman of Evergrowing when the Evergrowing-Kingold loans were originated, was placed under investigation. He was removed from his position and new management was installed. Song Hao may have been cognizant of and/or a party to the underlying fraud alleged herein, and his removal was in response to that fraud.

78.     In 2018, according to the Caixin Article, Defendant Jia purchased equity in the state-owned Tri-Ring Corporation ("Tri-Ring") as part of a privatization initiative by the Chinese

Government. The Caixin Article suggests that substantial portions of the loans taken out by Wuhan Kingold were in fact used to support Defendant Jia's purchase of Tri-Ring. Moreover, Tri-Ring became subject to a government investigation and, as part of that investigation, Tri-Ring's assets were frozen. Reporting indicates that substantial portions of the loans taken out by Wuhan Kingold were in fact used to provide liquidity to Tri-Ring. Tri-Ring is not mentioned as a related entity or in any other capacity in the Company's filings.

79.     As revealed in the Caixin Article, in 2019, Evergrowing sued the Company to obtain repayment for loans on which the Company had defaulted.

80.     Evergrowing then attempted to liquidate the gold collateral provided by Kingold and stored by Evergrowing. At this time, the collateral was reportedly determined to be copper alloy underneath gold gilt. However, this information was not publicized or reported in English-language media. It is unknown whether this information was publicized or reported in Chinese-language media.

**<u>Materially False and Misleading Statements</u>**

***March 15, 2018 10-K***

81.     On March 15, 2018, Kingold filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Jia, Liu, Wang, Chen, Wu, and Xia, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

82.     As to investment in gold, the 2017 10-K stated, in relevant part:

We pledged the gold leased from related party and part of our own gold inventory to meet the requirements of bank loans. The pledged gold will be available for sale upon the repayment of the bank loans. We classified these pledged gold as investments in gold, and carried at fair market value, with the unrealized gains and losses, included in the determination of comprehensive income and reported in shareholders' equity. The fair market value of the investments in gold is determined by quoted market prices at Shanghai Gold Exchange. Since the investments in gold are pledged for the bank loans, any material decrease in market value may negatively impact the loan covenants.

<p style="text-align:center">*     *     *</p>

The Company also allocated significant portion of its inventories as investment in gold and pledged as collateral to secure loans from banks and financial institutions, so there is a risk that the Company is unable to utilize its inventories, and there could be a disruption in the Company's supply of gold which could decrease its production and shipping levels. In addition, the investment in gold may be deficient if the fair market value of the pledged gold in connection with the loans declines, then the Company may need to increase the pledged gold inventory for the loan collateral or increase restricted cash.

83.     As to gold-backed loans from Anxin, the 2017 10-K stated, in relevant part:

(u) Loans payable to Anxin Trust Co., Ltd

In January 2016, Wuhan Kingold signed a Collective Trust Loan Agreement with Anxin Trust Co., Ltd. ("Anxin Trust"). The agreement allows the Company to access of approximately $461.1 million (RMB 3 billion) within 60 months. Each individual loan will bear a fixed annual interest of 14.8% or 11% with various maturity dates from February 19, 2019 to October 12, 2019. The purpose of this trust loan is to provide working capital for the Company to purchase gold. The loan is secured by 15,450 kilograms of Au9999 gold in aggregate with carrying value of approximately $552.1 million (RMB 3.6 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2017, the Company received full amount from the loan. The Company also made a restricted deposit of approximately $4.6 million (RMB 30 million) to secure these loans. The deposit will be refunded when the loan is repaid upon maturity.

84.     As to gold-backed loans from Chang'An, the 2017 10-K stated, in relevant part:

(v) Loans payable to Chang'An Trust

On March 9, 2016, Wuhan Kingold entered into a Trust Loan Contract with Chang'An International Trust Co., Ltd. ("Chang'An Trust"). The agreement allows the Company to access a total of approximately $46.1 million (RMB 300 million) for the purpose of working capital needs. During the year ended December 31, 2017, the Company fully repaid the loan. As of December 31, 2017, the restricted deposit was refunded to the Company.

In September 2017, Wuhan Kingold entered into a new Trust Loan Contract with Chang'An Trust. The agreement allows the Company to access a total of approximately $153.7 million (RMB 1 billion) for the purpose of working capital needs. The loan bears a fixed annual interest of 10% with a term of 24 months and is secured by 4,784 kilograms

of Au9999 gold in aggregate with carrying value of approximately $172.7 million (RMB 1.1 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2017, the Company received full amount from the loan. The Company also made a restricted deposit of approximately $1.5 million (RMB 10 million) to secure these loans. The deposit will be refunded when the loan is repaid upon maturity.

The Company paid approximately $1.7 million (RMB 11.0 million) as loan origination fee for obtaining the new loan. The loan origination fee was recorded as deferred financing cost against the loan balance. For the year ended December 31, 2017, approximately $0.1 million (RMB 0.8 million) deferred financing cost was amortized. As of December 31, 2017, the unamortized deferred financing cost related to obtaining this loan was approximately $1.6 million (RMB 10.2 million).

85.     As to gold-backed loans from Evergrowing, the 2017 10-K stated, in relevant part:

(e) Loans payable to Evergrowing Bank - Yantai Huangshan Road Branch

From February 24, 2016 to March 24, 2016, Wuhan Kingold signed ten Loan Agreements with the Yantai Huangshan Road Branch of Evergrowing Bank for loans of approximately $153.7 million (RMB 1 billion) in aggregate. The purpose of the loans is for purchasing gold. The terms of loans are two years and bear fixed interest of 7% per year. The loans are secured by 5,550 kilograms of Au9999 gold in aggregate with carrying value of approximately $198.3 million (RMB 1.3 billion) and are guaranteed by the CEO and Chairman of the Company. Based on the loan repayment plan as specified in the loan agreements, approximately $153,695 (RMB 1 million) was repaid in August 2016, approximately $153,695 (RMB 1 million) was repaid on February 23, 2017 and another $153,695 (RMB 1 million) was repaid on August 23, 2017. The repayment of the loans may be accelerated under certain conditions, including upon a default of principal or interest payment when due, breach of representations or warranties, certain cross-defaults, upon the occurrence of certain material events affecting the financial viability of Wuhan Kingold, and other customary conditions.

The Company subsequently repaid $76.4 million (RMB 497 million) to Evergrowing bank Yantai Huangshan Road Branch upon maturity. For the remaining $76.8 million (RMB 500 million) to be matured on March 9, 2018 and March 21, 2018, respectively, the Company subsequently entered into a loan extension agreement with the bank to extend the loan borrowing period for additional seven months until October 2018, with the same interest rate of 7% per year.

86.     As to gold-backed loans from Minsheng, the 2017 10-K stated, in relevant part:

(a) Loan payable to Minsheng Trust

A Trust Loan Agreement with the Minsheng Trust was fully repaid upon maturity and the pledged gold and restricted deposit were released and refunded upon the repayment.

*       *       *

(n) Loan payable to Minsheng Trust

On June 24, 2016, Wuhan Kingold entered into a loan agreement with Minsheng Trust, with an aggregate amount of approximately \$30.7 million (RMB 200 million), with a maturity date of June 22, 2018. During the year ended December 31, 2017, the Company fully repaid the loan. The pledged gold and restricted deposit were released and refunded upon the repayment.

The Company paid approximately \$0.8 million (RMB 5.3 million) as loan origination fee for obtaining the loan. For the years ended December 31, 2017 and 2016, approximately \$0.6 million (RMB 3.9 million) and \$0.2 million (RMB 1.4 million) deferred financing cost was amortized, respectively. As of December 31, 2017, the deferred financing cost was fully amortized.

87.     The above-referenced statements in the 2017 10-K were false and misleading because they failed to disclose that the Company's loans had been secured with gilded copper bars that the Individual Defendants had represented as genuine gold.

88.     The 2017 10-K also provided the Company's consolidated balance sheet, which is reproduced below:

<div align="center">

**KINGOLD JEWELRY, INC.**
**Five-Year Summary of Selected Financial Data**
**(in millions, except for the per share data)**

</div>

| | As of and for the years ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2017** | **2016** | **2015** | **2014** | **2013** |
| **Consolidated Statement of Operations Data:** | | | | | |
| Net sales | $   2,009.7 $ | 1,420.6 $ | 1,000.1 $ | 1,107.5 $ | 1,189.9 |
| Cost of sales | (1,809.8) | (1,274.2) | (961.8) | (1,031.3) | (1,142.9) |
| Gross profit | 199.9 | 146.4 | 38.3 | 76.2 | 47.0 |
| Operating expenses | (13.9) | (12.4) | (8.3) | (10.6) | (6.5) |
| Other expenses, net | (150.6) | (8.4) | (2.1) | (1.5) | (1.0) |
| Income tax provision | (9.2) | (32.6) | (6.3) | (16.8) | (11.2) |
| Net income | 26.2 | 92.9 | 21.6 | 47.3 | 28.3 |
| **Share date** | | | | | |
| Weighted average shares - basic | 66,050,498 | 65,991,487 | 65,963,502 | 65,918,768 | 63,495,520 |
| Weighted average shares - diluted | 66,472,046 | 66,337,129 | 65,963,502 | 66,007,075 | 63,902,912 |
| **Per share data** | | | | | |
| Earnings per share - basic | $        0.40 $ | 1.41 $ | 0.33 $ | 0.72 $ | 0.45 |
| Earnings per share – dilute | $        0.39 $ | 1.40 $ | 0.33 $ | 0.72 $ | 0.44 |
| **Selected Consolidated Balance Sheet Data:** | | | | | |
| Cash | $         5.0 $ | 21.3 $ | 3.1 $ | 1.3 $ | 2.3 |

<div align="center">

26

</div>

| | | | | | |
|---|---|---|---|---|---|
| Restricted cash – current | | 5.5 | 52.8 | 26.6 | 14.8 | 12.7 |
| Restricted cash – non-current | | 7.4 | 7.6 | - | - | - |
| Inventory | | 135 | 119.4 | 298.3 | 212.4 | 174.4 |
| Investments in gold - current | | 1,562.9 | 281.9 | - | - | - |
| Investments in gold – non-current | | 957.1 | 1,493.9 | - | - | - |
| Total assets | $ | 3,042.3 $ | 2,262.4 $ | 469.6 $ | 311.7 $ | 301.1 |
| Short term loans | | 962.1 | 234.7 | 55.5 | 45.1 | 49.6 |
| Long term loans | | 789.4 | 1,224.8 | 30.8 | 3.7 | 29.0 |
| Related parties loans – short term | | 307.4 | - | - | - | - |
| Related parties loans – long term | | 567.8 | 460.8 | - | - | - |
| Total liabilities | $ | 2,652.1 $ | 1,979.9 $ | 203.9 $ | 53.5 $ | 86.2 |
| Total stockholders' equity | $ | 390.2 $ | 282.5 $ | 265.7 $ | 258.2 $ | 214.9 |

89.     The above-referenced consolidated balance sheet in the 2017 10-K was materially false and misleading because it overstated assets as of December 31, 2017 due to the Company's misrepresentation of the worth of its investments in gold and the resulting impact on the Company's loans.

**_May 10, 2018 10-Q_**

90.     On May 10, 2018, Kingold filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Jia and Liu, and contained SOX certifications signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

91.     The 1Q18 10-Q provided the Company's consolidated balance sheet, which is reproduced below:

<div align="center">

**KINGOLD JEWELRY, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(IN U.S. DOLLARS)**
**(UNAUDITED)**

</div>

| | March 31, 2018 | December 31, 2017 |
|---|---|---|

|  | (Unaudited) | |
|---|---|---|
| **ASSETS** | | |
| Cash | $ 999,156 | $ 4,997,125 |
| Restricted cash | 6,691,929 | 5,534,551 |
| Accounts receivable | - | 768,167 |
| Inventories | 306,512,889 | 135,042,713 |
| Investments in gold | 1,177,796,726 | 1,562,943,153 |
| Other current assets and prepaid expenses | 719,778 | 100,592 |
| Value added tax recoverable | 328,973,748 | 353,732,758 |
| Total current assets | 1,821,694,226 | 2,063,119,059 |
| Property and equipment, net | 7,148,280 | 7,299,643 |
| Restricted cash | 8,928,941 | 7,392,721 |
| Investments in gold | 1,085,565,622 | 957,124,267 |
| Other assets | 312,927 | 302,072 |
| Deferred income tax assets | 12,953,934 | 6,677,675 |
| Land use right | 442,355 | 429,915 |
| Total long-term assets | 1,115,352,059 | 979,226,293 |
| **TOTAL ASSETS** | $2,937,046,285 | $3,042,345,352 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Short term loans | $ 906,862,905 | $ 962,101,746 |
| Other payables and accrued expenses | 19,844,109 | 18,913,863 |
| Related party loan | 79,608,961 | 307,389,647 |
| Due to related party | 3,102,653 | 2,630,301 |
| Income tax payable | 3,297,669 | 1,208,742 |
| Other taxes payable | 2,264,914 | 2,615,463 |
| Total current liabilities | 1,014,981,211 | 1,294,859,762 |
| Related party loans | 632,751,640 | 567,843,066 |
| Long term loans | 890,643,755 | 789,410,137 |
| **TOTAL LIABILITIES** | 2,538,376,606 | 2,652,112,965 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **EQUITY** | | |
| Preferred stock, $0.001 par value, 500,000 shares authorized, none issued or outstanding as of March 31, 2018 and December 31, 2017 | - | - |
| Common stock $0.001 par value, 100,000,000 shares authorized, 66,113,502 shares issued and outstanding as of March 31, 2018 and December 31, 2017 | 66,113 | 66,113 |
| Additional paid-in capital | 80,382,813 | 80,377,449 |
| Retained earnings | | |
| Unappropriated | 316,901,535 | 303,666,611 |
| Appropriated | 967,543 | 967,543 |
| Accumulated other comprehensive income, net of tax | 351,675 | 5,154,671 |
| Total Equity | 398,669,679 | 390,232,387 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $2,937,046,285 | $3,042,345,352 |

92.     The 1Q18 10-Q also provided a table of the Company's inventories, which, with

selected notes, is reproduced below:

**KINGOLD JEWELRY, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 3 – INVENTORIES**

Inventories as of March 31, 2018 and December 31, 2017 consisted of the following:

| | As of | |
|---|---|---|
| | **March 31, 2018** | **December 31, 2017** |
| | (unaudited) | |
| Raw materials (A) | $        177,684,115 | $                    - |
| Work-in-progress (B) | 81,470,668 | 90,406,021 |
| Finished goods (C) | 47,358,106 | 44,636,692 |
| Total inventory | $        306,512,889 | $        135,042,713 |

(A)  Included 4,751,394 grams of Au9999 gold as of March 31, 2018 and Nil Au9999 gold as of December 31, 2017.

93.     The above-referenced consolidated balance sheet and table of inventories contained in the 1Q18 10-Q were materially false and misleading because they represented the gilded copper alloy bars as genuine gold and failed to disclose that the Company's loans had been secured with counterfeit gold.

**_August 9, 2018 10-Q_**

94.     On August 9, 2018, Kingold filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Jia and Liu, and contained SOX certifications signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     The 2Q18 10-Q provided the Company's consolidated balance sheet, which is reproduced below:

**KINGOLD JEWELRY, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(IN U.S. DOLLARS)**
**(UNAUDITED)**

|  | June 30, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| Cash | $        240,453 | $        4,997,125 |
| Restricted cash | 6,965,467 | 5,534,551 |
| Accounts receivable | - | 768,167 |
| Inventories | 150,437,622 | 135,042,713 |
| Investments in gold | 1,185,042,807 | 1,562,943,153 |
| Other current assets and prepaid expenses | 250,183 | 100,592 |
| Value added tax recoverable | 274,033,622 | 353,732,758 |
| Total current assets | 1,616,970,154 | 2,063,119,059 |
| Property and equipment, net | 6,517,129 | 7,299,643 |
| Restricted cash | 7,600,532 | 7,392,721 |
| Investments in gold | 908,899,905 | 957,124,267 |
| Other assets | 296,897 | 302,072 |
| Deferred income tax assets | 18,545,561 | 6,677,675 |
| Land use right | 416,840 | 429,915 |
| Total long-term assets | 942,276,864 | 979,226,293 |
| **TOTAL ASSETS** | $2,559,247,018 | $3,042,345,352 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Short term loans | $  908,635,791 | $  962,101,746 |
| Other payables and accrued expenses | 19,906,196 | 18,913,863 |
| Related party loan | 75,530,983 | 307,389,647 |
| Due to related party | 3,420,269 | 2,630,301 |
| Income tax payable | 4,015,473 | 1,208,742 |
| Other taxes payable | 2,496,472 | 2,615,463 |
| Total current liabilities | 1,014,005,184 | 1,294,859,762 |
| Related party loans | 414,034,451 | 567,843,066 |
| Long term loans | 758,141,473 | 789,410,137 |
| **TOTAL LIABILITIES** | 2,186,181,108 | 2,652,112,965 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **EQUITY** | | |
| Preferred stock, $0.001 par value, 500,000 shares authorized, none issued or   outstanding as of June 30, 2018 and December 31, 2017 | - | - |
| Common stock $0.001 par value, 100,000,000 shares authorized, 66,113,502 shares issued and outstanding as of June 30, 2018 and December 31, 2017 | 66,113 | 66,113 |
| Additional paid-in capital | 80,388,177 | 80,377,449 |
| Retained earnings | | |
| Unappropriated | 330,465,332 | 303,666,611 |
| Appropriated | 967,543 | 967,543 |
| Accumulated other comprehensive income (loss), net of tax | (38,821,255) | 5,154,671 |
| Total Equity | 373,065,910 | 390,232,387 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $2,559,247,018 | $3,042,345,352 |

96.     The 2Q18 10-Q also provided a table of the Company's inventories, which is reproduced below:

**NOTE 3 – INVENTORIES**

Inventories as of June 30, 2018 and December 31, 2017 consisted of the following:

|  | As of | |
|---|---|---|
|  | **June 30, 2018** | **December 31, 2017** |
|  | **(unaudited)** | |
| Raw materials (A) | $       36,485,384 | $                        - |
| Work-in-progress (B) | 71,331,336 | 90,406,021 |
| Finished goods (C) | 42,620,902 | 44,636,692 |
| Total inventory | $     150,437,622 | $    135,042,713 |

(A)  Included 1,030,355 grams of Au9999 gold as of June 30, 2018 and Nil Au9999 gold as of December 31, 2017.
(B)  Included 2,020,544 grams of Au9999 gold June 30, 2018 and 2,508,182 grams of Au9999 gold as of December 31, 2017.
(C)  Included 1,199,154 grams of Au9999 gold June 30, 2018 and 1,231,586 grams of Au9999 gold as of December 31, 2017.

97.     The above-referenced consolidated balance sheet and table of inventories contained in the 2Q18 10-Q were materially false and misleading because they represented the gilded copper alloy bars as genuine gold and failed to disclose that the Company's loans had been secured with counterfeit gold.

### *November 14, 2018 10-Q*

98.     On November 14, 2018, Kingold filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Jia and Liu, and contained SOX certifications signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

99.     The 3Q18 10-Q provided the Company's consolidated balance sheet, which is reproduced below:

**KINGOLD JEWELRY, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(IN U.S. DOLLARS)**
**(UNAUDITED)**

|  | September 30, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| Cash | $ 13,245,436 | $ 4,997,125 |
| Restricted cash | 6,567,855 | 5,534,551 |
| Accounts receivable | 198,214 | 768,167 |
| Inventories | 147,264,405 | 135,042,713 |
| Investments in gold | 922,084,336 | 1,562,943,153 |
| Other current assets and prepaid expenses | 808,809 | 100,592 |
| Value added tax recoverable | 254,820,263 | 353,732,758 |
| Total current assets | 1,344,989,318 | 2,063,119,059 |
| Property and equipment, net | 5,903,782 | 7,299,643 |
| Restricted cash | 8,927,100 | 7,392,721 |
| Investments in gold | 1,071,005,836 | 957,124,267 |
| Other assets | 286,155 | 302,072 |
| Deferred income tax assets | 22,054,343 | 6,677,675 |
| Land use right | 399,007 | 429,915 |
| Total long-term assets | 1,108,576,223 | 979,226,293 |
| **TOTAL ASSETS** | $2,453,565,541 | $3,042,345,352 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Short term loans | $ 621,518,946 | $ 962,101,746 |
| Other payables and accrued expenses | 18,845,062 | 18,913,863 |
| Related party loan | 72,798,218 | 307,389,647 |
| Due to related party | 3,592,726 | 2,630,301 |
| Income tax payable | 1,855,002 | 1,208,742 |
| Other taxes payable | 2,818,412 | 2,615,463 |
| Total current liabilities | 721,428,366 | 1,294,859,762 |
| Related party loans | 451,657,343 | 567,843,066 |
| Long term loans | 926,174,267 | 789,410,137 |
| **TOTAL LIABILITIES** | 2,099,259,976 | 2,652,112,965 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **EQUITY** | | |
| Preferred stock, $0.001 par value, 500,000 shares authorized, none issued or outstanding as of September 30, 2018 and December 31, 2017 | - | - |
| Common stock $0.001 par value, 100,000,000 shares authorized, 66,113,502 shares issued and outstanding as of September 30, 2018 and December 31, 2017 | 66,113 | 66,113 |
| Additional paid-in capital | 80,393,541 | 80,377,449 |
| Retained earnings | | |
| Unappropriated | 343,712,836 | 303,666,611 |
| Appropriated | 967,543 | 967,543 |
| Accumulated other comprehensive income (loss), net of tax | (70,834,468) | 5,154,671 |
| Total Equity | 354,305,565 | 390,232,387 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $2,453,565,541 | $3,042,345,352 |

100.    The 3Q18 10-Q also provided a table of the Company's inventories, which is reproduced below:

**NOTE 3 – INVENTORIES**

Inventories as of September 30, 2018 and December 31, 2017 consisted of the following:

|  |  | As of | |
| --- | --- | --- | --- |
|  |  | September 30, 2018 (unaudited) | December 31, 2017 |
| Raw materials (A) | $ | 32,787,260 $ | - |
| Work-in-progress (B) |  | 71,524,413 | 90,406,021 |
| Finished goods (C) |  | 42,952,732 | 44,636,692 |
| Total inventory | $ | 147,264,405 $ | 135,042,713 |

(A) Included 964,769 grams of Au9999 gold as of September 30, 2018 and Nil Au9999 gold as of December 31, 2017.
(B) Included 2,110,166 grams of Au9999 gold as of September 30, 2018 and 2,508,182 grams of Au9999 gold as of December 31, 2017.
(C) Included 1,258,327 grams of Au9999 gold as of September 30, 2018 and 1,231,586 grams of Au9999 gold as of December 31, 2017.

101.    The above-referenced consolidated balance sheet and table of inventories contained in the 3Q18 10-Q were materially false and misleading because they represented the gilded copper alloy bars as genuine gold and failed to disclose that the Company's loans had been secured with counterfeit gold.

***November 14, 2018 8-K***

102.    On November 14, 2018, Kingold filed a current report on Form 8-K (the "November 2018 8-K"), in which the Company disclosed that it had been notified of its noncompliance with a condition of its listing on the NASDAQ, specifically, NASDAQ Marketplace Rule 5550(a)(2) (the "Minimum Bid Price Rule") because Kingold's shares had closed below $1.00 per share on each of the thirty consecutive business days from September 26, 2018 until November 8, 2018, inclusive.

103.    The November 2018 8-K further disclosed that Kingold had a 180 calendar day period in which to regain compliance by closing at $1.00 or greater per share over ten consecutive

business days, and that if it could not do so and/or if it was not granted an extension, then Kingold shares would be subject to delisting.

### November 16, 2018 Proxy Statement

104.    On November 16, 2018, Kingold filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Jia, Wang, Chen, Wu, and Xia solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

105.    With respect to the Code of Ethics, the 2018 Proxy Statement stated that Kingold had "adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting."

106.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, the Individual Defendants' engagement in the Counterfeit Collateral Scheme, and the Individual Defendants' failures to report violations of the Code of Ethics.

107.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Individual Defendants improperly engaged in the Counterfeit Collateral Scheme to represent gilded copper alloy bars as genuine gold and thereby fraudulently obtain loans; (2) due to the Company's purported gold being gilded copper bars, the value of the gold assets reported in the Company's financial statements was fraudulently inflated; (3) the foregoing misconduct would foreseeably

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

subject the Company to litigation with various Creditors and to various regulatory consequences, including delisting from the Shanghai Gold Exchange and an investigation by the PRC; and (4) the Company failed to maintain both its internal operational and financial controls. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.

### April 2, 2019 10-K

108.    On April 2, 2019, Kingold filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Jia, Liu, Wang, Chen, Wu, and Xia, and contained SOX certifications signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109.    In regard to legal proceedings, the 2018 10-K stated that "[w]e are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition."

110.    The above-referenced statement in the 2018 10-K was false and misleading because it failed to disclose that the Company was involved in material litigation with the Yaoxin branch of Hengfeng Evergrowing Bank in relation to default on its loans and the subsequent discovery that the "gold" bars securing those loans were not, in fact, made of gold as the Individual Defendants had represented to the Lenders and to the investing public.

111.    As to investment in gold, the 2018 10-K stated, in relevant part:

We pledged the gold leased from related party and part of our own gold inventory to meet the requirements of bank loans. The pledged gold will be available for sale upon the repayment of the bank loans. We classified these pledged gold as investments in gold, and

carried at fair market value, with the unrealized gains and losses, included in the determination of comprehensive income and reported in shareholders' equity. The fair market value of the investments in gold is determined by quoted market prices at Shanghai Gold Exchange. Since the investments in gold are pledged for the bank loans, any material decrease in market value may negatively impact the loan covenants.

<p style="text-align:center">*       *       *</p>

The Company also allocated significant portion of its inventories as investment in gold and pledged as collateral to secure loans from banks and financial institutions, so there is a risk that the Company is unable to utilize its inventories, and there could be a disruption in the Company's supply of gold which could decrease its production and shipping levels. In addition, the investment in gold may be deficient if the fair market value of the pledged gold in connection with the loans declines, then the Company may need to increase the pledged gold inventory for the loan collateral or increase restricted cash.

112.    As to gold-backed loans from Anxin, the 2018 10-K stated, in relevant part:

(l) Loans payable to Anxin Trust Co., Ltd

In January 2016, Wuhan Kingold signed a Collective Trust Loan Agreement with Anxin Trust Co., Ltd. ("Anxin Trust"). The agreement allowed the Company to access of approximately $436.2 million (RMB 3 billion) within 60 months. Each individual loan will bear a fixed annual interest of 14.8% or 11% with various maturity dates from February 19, 2019 to October 12, 2019. The purpose of this trust loan was to provide working capital for the Company to purchase gold. The loan is secured by 15,450 kilograms of Au9999 gold in aggregate with carrying value of approximately $522.3  million (RMB 3.6 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2018, the Company received full amount from the loan.

During the year ended December 31, 2018, the Company repaid approximately $81.4 million (RMB 0.56 billion), which resulted in an outstanding balance of approximately $354.8 million (RMB 2.44 billion) as of December 31, 2018 reported as short term loans. The Company also made a restricted deposit of approximately $3.5 million (RMB 24 million) to secure the rest of these loans. The deposit will be refunded when the loan is repaid upon maturity. In February and March 2019, the Company subsequently made repayments total of approximately $24 million (RMB 165 million) and extended the loans of approximately $18.5 million (RMB 127 million) which originally due on March 29, 2019 to May 17, 2019.

113.    As to gold-backed loans from Chang'An, the 2018 10-K stated, in relevant part:

(o) Loans payable to Chang'An Trust

In September 2017, Wuhan Kingold entered into a new Trust Loan Contract with Chang'An Trust. The agreement allows the Company to access a total of approximately $145.4 million (RMB 1 billion) for the purpose of working capital needs. The loan bears a fixed annual interest of 10% with a term of 24 months and is secured by 4,784 kilograms

of Au9999 gold in aggregate with carrying value of approximately $163.4 million (RMB 1.1 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2018, the Company received full amount from the loan. The Company also made a restricted deposit of approximately $1.5 million (RMB 10 million) to secure these loans. The deposit will be refunded when the loan is repaid upon maturity. On September 30, 2018, the Company made repayment of approximately $2.9 million (RMB 20 million). On October 31, 2018, the Company made additional repayment of approximately $25.9 million (RMB 178.2 million) to Chang'An Trust. As of December 31, 2018, the balance of loans from Chang'An Trust was approximately $116.6 (RMB 801.9 million).

114.    As to gold-backed loans from Dongguan, the 2018 10-K stated, in relevant part:

(x) Loans payable to Dongguan Trust

In July 2018, Wuhan Kingold entered into a gold income rights transfer and repurchase agreement (the "Agreement") with Dongguan Trust. The Agreement allows the Company to obtain no more than approximately $145.4 million (RMB 1 billion) to exchange the income earning rights of the Company. The Company committed to buy back the rights and repay the proceeds received, and shall pay a fixed interest of 11% over a term of 18 months. The Company determined that this Agreement is essentially a loan agreement due to the nature of this transaction. This loan is secured by 4,974 kilograms of Au9999 gold in aggregate with carrying value of approximately $165.8 million (RMB 1,140 million). The loan is also guaranteed by the CEO and Chairman of the Company. The Company also made a restricted deposit of approximately $1.5 million (RMB 10 million) to secure the loan. The deposit will be refunded when the loan is repaid upon maturity.

The Company paid approximately $2.2 million (RMB 15 million) as loan origination fee for obtaining this loan. The loan origination fee was recorded as deferred financing cost against the loan balance. For year ended December 31, 2018, approximately $0.6 million (RMB 3.9 million) deferred financing cost was amortized.

115.    As to gold-backed loans from Evergrowing, the 2018 10-K stated, in relevant part:

(c) Loans payable to Evergrowing Bank – Yantai Huanshan Road Branch

From February 24, 2016 to March 24, 2016, Wuhan Kingold signed ten Loan Agreements with the Yantai Huangshan Road Branch of Evergrowing Bank for loans of approximately $145.4 million (RMB 1 billion) in aggregate. The purpose of the loans was for purchasing gold. The terms of loans are two years and bear fixed interest of 4.75% per year. Based on the loan repayment plan as specified in the loan agreements, $145,400 (RMB 1 million) was repaid in August 2016, $145,400 (RMB 1 million) was repaid on February 23, 2017 and another $145,400 (RMB 1 million) was repaid in August 23, 2017. The Company repaid approximately $72.3 million (RMB 497 million) to Evergrowing bank Yantai Huangshan Road Branch upon maturity.

For the remaining balance of approximately $72.7 million (RMB 500 million), the Company entered into a loan extension agreement with the bank to extend the loan borrowing period for additional seven months until October 2018, with the new interest rate of 6.5% per year. The loans are secured by 2,735 kilograms of Au9999 gold in aggregate with carrying value of approximately $92.5 million (RMB 635.9 million) and are guaranteed by the CEO and Chairman of the Company. Upon the maturity of these loans, the Company entered into a series of supplemental agreements with Yantai Huanshan Road Branch of Evergrowing Bank to extend the term of the loan for additional 12 months.

116.    As to gold-backed loans from Minsheng, the 2018 10-K stated, in relevant part:

(n) Loan payable to Minsheng Trust (new)

On October 10, 2018, the Company entered into a Trust Loan Contract in the amount of no more than approximately $145.4 million (RMB 1.0 billion) with China Minsheng Trust Co., Ltd. ("Minsheng Trust"). The purpose of the trust loan is to supplement liquidity needs. The Trust Loan will be issued in installments. Each installment of the Trust Loan has a 12-month term, and the period from issuance date of the first installment to the expiration date of the last installment shall not exceed 18 months. The Trust Loan bears interest at a fixed annual rate of 10.5%. The loan is secured by 5,356 kilograms of Au9999 gold in aggregate with carrying value of approximately $181.9 million (RMB 1.3 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2018, the Company received the full amount from the loan.

\*       \*       \*

(p) Loan payable to Minsheng Trust

On December 26, 2017, the Company entered into a Trust Loan Contract in the amount of no more than approximately $218.1 million (RMB 1.5 billion) with China Minsheng Trust Co., Ltd. ("Minsheng Trust"). The purpose of the trust loan is to supplement liquidity needs. The Trust Loan will be issued in installments. Each installment of the Trust Loan has a 24-month term, and the period from issuance date of the first installment to the expiration date of the last installment shall not exceed 30 months. The Trust Loan bears interest at a fixed annual rate of 9.2%. The loan is secured by 7,887 kilograms of Au9999 gold in aggregate with carrying value of approximately $270.2 million (RMB 1.9 billion). The loan is also guaranteed by the CEO and Chairman of the Company. The Company made a restricted deposit of approximately $2.2 million (RMB 15 million) to secure these loans. The deposit will be refunded when the loan is repaid upon maturity. As of December 31, 2018, the Company received full amount from the loan.

The Company paid approximately $7.8 million (RMB 53.5 million) as loan origination fee for obtaining this loan. The loan origination fee was recorded as deferred financing cost against the loan balance. For the year ended December 31, 2018 approximately $4.0 million (RMB 26.6 million) deferred financing cost was amortized.

117.   The above-referenced statements in the 2018 10-K were false and misleading because they failed to disclose that the Company's loans had been secured with gilded copper bars that the Individual Defendants had represented as genuine gold.

118.   The 2018 10-K also provided the Company's consolidated balance sheet, which is reproduced below:

### KINGOLD JEWELRY, INC.
### CONSOLIDATED BALANCE SHEETS
### (IN U.S. DOLLARS)

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| Cash | $        233,391 | $     4,997,125 |
| Restricted cash | 4,798,185 | 5,534,551 |
| Accounts receivable | 451,059 | 768,167 |
| Inventories | 127,034,673 | 135,042,713 |
| Investments in gold | 1,593,557,391 | 1,562,943,153 |
| Other current assets and prepaid expenses | 87,590 | 100,592 |
| Value added tax recoverable | 259,582,324 | 353,732,758 |
| Total current assets | 1,985,744,613 | 2,063,119,059 |
| | | |
| Property and equipment, net | 5,395,330 | 7,299,643 |
| Restricted cash | 7,766,372 | 7,392,721 |
| Investments in gold | 700,225,896 | 957,124,267 |
| Other assets | 285,768 | 302,072 |
| Deferred income tax assets | - | 6,677,675 |
| Land use right | 395,719 | 429,915 |
| Total long-term assets | 714,069,085 | 979,226,293 |
| **TOTAL ASSETS** | $2,699,813,698 | $3,042,345,352 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Short term loans | $1,034,947,774 | $   962,101,746 |
| Other payables and accrued expenses | 15,749,564 | 18,913,863 |
| Related party loan | 72,699,779 | 307,389,647 |
| Due to related party, shareholder | 3,976,742 | 2,630,301 |
| Income tax payable | 18,504,197 | 1,208,742 |
| Other taxes payable | 2,577,102 | 2,615,463 |
| Total current liabilities | 1,148,455,158 | 1,294,859,762 |
| Deferred income tax liability | 24,218,911 | - |
| Related party loans | 373,327,862 | 567,843,066 |
| Long term loans | 515,477,020 | 789,410,137 |
| **TOTAL LIABILITIES** | 2,061,478,951 | 2,652,112,965 |

**COMMITMENTS AND CONTINGENCIES**

| EQUITY | | |
|---|---|---|
| Preferred stock, $0.001 par value, 500,000 shares authorized, none issued or outstanding as of December 31, 2018 and 2017 | - | - |
| Common stock $0.001 par value, 100,000,000 shares authorized, 66,113,502 shares issued and outstanding as of December 31, 2018 and 2017 | 66,113 | 66,113 |
| Additional paid-in capital | 224,292,907 | 80,377,449 |
| Retained earnings | | |
| Unappropriated | 353,213,325 | 303,666,611 |
| Appropriated | 967,543 | 967,543 |
| Accumulated other comprehensive income, net of tax | 59,794,859 | 5,154,671 |
| Total Equity | 638,334,747 | 390,232,387 |
| | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $2,699,813,698 | $3,042,345,352 |

119.    The above-referenced consolidated balance sheet in the 2018 10-K was materially false and misleading because it overstated assets as of December 31, 2018 due to the Company's misrepresentation of the worth of its investments in gold and the resulting impact on the Company's loans.

### *May 13, 2019 8-K*

120.    On May 13, 2019, Kingold filed a current report on Form 8-K (the "May 2019 8-K"), in which the Company disclosed that it had been unable to regain compliance with the Minimum Bid Price Rule by the May 8, 2019 deadline as required for listing on the NASDAQ. The Company further reported that it had been granted a 180-day extension, or until November 4, 2019, to regain compliance with the Minimum Bid Price Rule.

### *May 15, 2019 10-Q*

121.    On May 15, 2019, Kingold filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Jia and Liu, and contained SOX certifications signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

122.    The 1Q19 10-Q stated the following with respect to legal proceedings:

**Item 1. Legal Proceedings**

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition. Our business may also be adversely affected by risks and uncertainties not presently known to us or that we currently believe to be immaterial. If any of the events contemplated by the following discussion of risks should occur, our business, prospects, financial condition and results of operations may suffer.

123.    The above-referenced statement in the 1Q19 10-Q was false and misleading because it failed to disclose material legal proceedings involving the Company brought by Evergrowing Bank.

124.    The 1Q19 10-Q provided the Company's consolidated balance sheet, which is reproduced below:

**KINGOLD JEWELRY, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(IN U.S. DOLLARS)**
**(UNAUDITED)**

| | March 31, 2019 | December 31, 2018 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| Cash | $ 926,028 | $ 233,391 |
| Restricted cash | 15,705,478 | 4,798,185 |
| Accounts receivable | - | 451,059 |
| Inventories | 163,848,955 | 127,034,673 |
| Investments in gold | 2,174,076,950 | 1,593,557,391 |
| Value added tax recoverable | 277,741,555 | 259,582,324 |
| Prepaid expenses and other current assets | 381,376 | 87,590 |
| Total current assets | 2,632,680,342 | 1,985,744,613 |
| | | |
| Property and equipment, net | 5,104,757 | 5,395,330 |
| Restricted cash | 1,660,633 | 7,766,372 |
| Investments in gold | 232,428,147 | 700,225,896 |
| Land use right | 402,673 | 395,719 |
| Other noncurrent assets | 519,295 | 285,768 |
| Total long-term assets | 240,115,505 | 714,069,085 |
| **TOTAL ASSETS** | $2,872,795,847 | $2,699,813,698 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| | | |
| **CURRENT LIABILITIES** | | |

| | | |
|---|---:|---:|
| Short term loans | $1,600,320,041 | $1,034,947,774 |
| Related party loan | 74,494,554 | 72,699,779 |
| Due to related party | 4,164,872 | 3,976,742 |
| | | |
| Income tax payable | 15,443,613 | 18,504,197 |
| Other taxes payable | 2,008,975 | 2,577,102 |
| Accrued expenses and other payables | 16,457,625 | 15,749,564 |
| Total current liabilities | 1,712,889,680 | 1,148,455,158 |
| | | |
| Deferred tax liabilities | 12,809,830 | 24,218,911 |
| Other long-term liability | 163,887 | - |
| Related party loans | 348,912,801 | 373,327,862 |
| Long term loans | 166,063,261 | 515,477,020 |
| **TOTAL LIABILITIES** | 2,240,839,459 | 2,061,478,951 |
| | | |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **SHAREHOLDERS' EQUITY** | | |
| Preferred stock, $0.001 par value, 500,000 shares authorized, none issued or outstanding as of March 31, 2019 and December 31, 2018 | - | - |
| Common stock $0.001 par value, 100,000,000 shares authorized, 66,113,502 shares issued and outstanding as of March 31, 2019 and December 31, 2018 | 66,113 | 66,113 |
| Additional paid-in capital | 224,298,271 | 224,292,907 |
| Retained earnings | | |
| Unappropriated | 359,593,904 | 353,213,325 |
| Appropriated | 967,543 | 967,543 |
| Accumulated other comprehensive income, net of tax | 47,030,557 | 59,794,859 |
| Total Shareholders' Equity | 631,956,388 | 638,334,747 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $2,872,795,847 | $2,699,813,698 |

125.   The 1Q19 10-Q also provided a table of the Company's inventories, which is

reproduced below:

**NOTE 3 – INVENTORIES**

Inventories as of March 31, 2019 and December 31, 2018 consisted of the following:

| | As of | |
|---|---:|---:|
| | **March 31, 2019** | **December 31, 2018** |
| | **(unaudited)** | |
| Raw materials (A) | $ 53,960,649 | $ - |
| Work-in-progress (B) | 70,719,294 | 87,160,453 |
| Finished goods (C) | 39,169,012 | 39,874,220 |
| Total inventories | $ 163,848,955 | $ 127,034,673 |

(A) Included 1,536,517 grams of Au9999 gold as of March 31, 2019 and Nil Au9999 gold as of December 31, 2018.
 (B) Included 2,020,811 grams of Au9999 gold as of March 31, 2019 and 2,570,232 grams of Au9999 gold as of December 31, 2018.
(C) Included 1,111,725 grams of Au9999 gold as of March 31, 2019 and 1,168,892 grams of Au9999 gold as of December 31, 2018.

126.    The above-referenced consolidated balance sheet and table of inventories contained in the 1Q19 10-Q were materially false and misleading because they represented the gilded copper alloy bars as genuine gold and failed to disclose that the Company's loans had been secured with counterfeit gold.

### *August 9, 2019 10-Q*

127.    On August 9, 2019, Kingold filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Jia and Liu, and contained SOX certifications signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

128.    The 2Q19 10-Q stated the following with respect to legal proceedings:

**Item 1. Legal Proceedings**

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition. Our business may also be adversely affected by risks and uncertainties not presently known to us or that we currently believe to be immaterial. If any of the events contemplated by the following discussion of risks should occur, our business, prospects, financial condition and results of operations may suffer.

129.    The above-referenced statement in the 2Q19 10-Q was false and misleading because it failed to disclose material legal proceedings involving the Company brought by Evergrowing Bank.

130.    The 2Q19 10-Q provided the Company's consolidated balance sheet, which is reproduced below:

**KINGOLD JEWELRY, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

**(IN U.S. DOLLARS)**
**(UNAUDITED)**

|  | June 30, 2019 | December 31, 2018 |
|---|---|---|
|  | (Unaudited) |  |
| **ASSETS** |  |  |
|  |  |  |
| Cash | $   114,723,841 | $          233,391 |
| Restricted cash | 14,337,042 | 4,798,185 |
| Accounts receivable | 264,158 | 451,059 |
| Inventories | 262,763,620 | 127,034,673 |
| Investments in gold | 2,215,449,367 | 1,593,557,391 |
| Value added tax recoverable | 258,933,954 | 259,582,324 |
| Prepaid expenses and other current assets | 82,629 | 87,590 |
| Total current assets | 2,866,554,611 | 1,985,744,613 |
|  |  |  |
| Property and equipment, net | 4,924,793 | 5,395,330 |
| Restricted cash | 1,747,539 | 7,766,372 |
| Investments in gold | 246,949,601 | 700,225,896 |
| Land use right | 390,837 | 395,719 |
| Other noncurrent assets | 492,637 | 285,768 |
| Total long-term assets | 254,505,407 | 714,069,085 |
| **TOTAL ASSETS** | $3,121,060,018 | $2,699,813,698 |
|  |  |  |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |
|  |  |  |
| **CURRENT LIABILITIES** |  |  |
|  |  |  |
| Short term loans | $1,532,528,884 | $1,034,947,774 |
| Related party loan | 72,593,313 | 72,699,779 |
| Due to related party | 4,383,039 | 3,976,742 |
| Income tax payable | 18,955,285 | 18,504,197 |
| Other taxes payable | 2,150,167 | 2,577,102 |
| Accrued expenses and other payables | 14,855,067 | 15,749,564 |
| Total current liabilities | 1,645,465,755 | 1,148,455,158 |
|  |  |  |
| Deferred tax liabilities | 71,400,016 | 24,218,911 |
| Other long-term liability | 160,190 | - |
| Related party loans | 419,694,803 | 373,327,862 |
| Long term loans | 174,753,888 | 515,477,020 |
| **TOTAL LIABILITIES** | 2,311,474,652 | 2,061,478,951 |
|  |  |  |
| **COMMITMENTS AND CONTINGENCIES** |  |  |
| **SHAREHOLDERS' EQUITY** |  |  |
| Preferred stock, $0.001 par value, 500,000 shares authorized, none issued or   outstanding as of June 30, 2019 and December 31, 2018 | - | - |
| Common stock $0.001 par value, 100,000,000 shares authorized, 66,113,502   shares issued and outstanding as of June 30, 2019 and December 31, 2018 | 66,113 | 66,113 |
| Additional paid-in capital | 224,298,271 | 224,292,907 |
| Retained earnings |  |  |
| Unappropriated | 372,183,091 | 353,213,325 |
| Appropriated | 967,543 | 967,543 |
| Accumulated other comprehensive income, net of tax | 212,070,348 | 59,794,859 |
| Total Shareholders' Equity | 809,585,366 | 638,334,747 |

| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $3,121,060,018 | $2,699,813,698 |
| --- | --- | --- |

131.    The 2Q19 10-Q also provided a table of the Company's inventories, which is reproduced below:

**NOTE 3 – INVENTORIES**

Inventories as of June 30, 2019 and December 31, 2018 consisted of the following:

| | As of | |
| --- | --- | --- |
| | **June 30, 2019** | **December 31, 2018** |
| | **(unaudited)** | |
| Raw materials (A) | $148,873,722 | $        - |
| Work-in-progress (B) | 73,045,237 | 87,160,453 |
| Finished goods (C) | 40,844,661 | 39,874,220 |
| Total inventories | $262,763,620 | $    127,034,673 |

(A)Included 4,280,771 grams of Au9999 gold as of June 30, 2019 and Nil Au9999 gold as of December 31, 2018.
(B)Included 2,108,382 grams of Au9999 gold as of June 30, 2019 and 2,570,232 grams of Au9999 gold as of December 31, 2018.
(C)Included 1,172,133 grams of Au9999 gold as of June 30, 2019 and 1,168,892 grams of Au9999 gold as of December 31, 2018.

132.    The above-referenced consolidated balance sheet and table of inventories contained in the 2Q19 10-Q were materially false and misleading because they represented the gilded copper alloy bars as genuine gold and failed to disclose that the Company's loans had been secured with counterfeit gold.

### *The October 2019 Stock Split*

133.    On October 21, 2019, Kingold filed a current report on Form 8-K disclosing that the Company would transact a six-for-one reverse stock split, effective the following day, in order to comply with NASDAQ's Minimum Bid Price Requirement.

134.    This resulted in the price of the Company's stock closing at $2.98 per share on October 22, 2019, the date on which the split was effectuated.

### *November 12, 2019 10-Q*

135.    On November 12, 2019, Kingold filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by

Defendants Jia and Liu, and contained SOX certifications signed by Defendants Jia and Liu attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

136.   The 3Q19 10-Q stated the following with respect to legal proceedings:

**Item 1. Legal Proceedings**

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition. Our business may also be adversely affected by risks and uncertainties not presently known to us or that we currently believe to be immaterial. If any of the events contemplated by the following discussion of risks should occur, our business, prospects, financial condition and results of operations may suffer.

137.   The above-referenced statement in the 3Q19 10-Q was false and misleading because it failed to disclose material legal proceedings involving the Company brought by Evergrowing Bank.

138.   The 3Q19 10-Q provided the Company's consolidated balance sheet, which is reproduced below:

<div align="center">

**KINGOLD JEWELRY, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(IN U.S. DOLLARS)**
**(UNAUDITED)**

</div>

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| | | (Audited) |
| **ASSETS** | | |
| Cash | $       651,318 | $       233,391 |
| Restricted cash | 14,632,279 | 4,798,185 |
| Accounts receivable | 654,455 | 451,059 |
| Inventories | 268,214,300 | 127,034,673 |
| Investments in gold | 2,323,335,559 | 1,593,557,391 |
| Value added tax recoverable | 242,624,812 | 259,582,324 |
| Short-term investments | 195,062,420 | - |
| Prepaid expenses and other current assets | 374,843 | 87,590 |
| Total current assets | 3,045,549,986 | 1,985,744,613 |

| | | |
|---|---:|---:|
| Property and equipment, net | 4,420,547 | 5,395,330 |
| Restricted cash | 1,681,073 | 7,766,372 |
| Investments in gold | 267,177,647 | 700,225,896 |
| Land use right | 373,324 | 395,719 |
| Other noncurrent assets | 459,524 | 285,768 |
| Total long-term assets | 274,112,115 | 714,069,085 |
| **TOTAL ASSETS** | $3,319,662,101 | $2,699,813,698 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

**CURRENT LIABILITIES**

| | | |
|---|---:|---:|
| Short term loans | $1,423,679,826 | $1,034,947,774 |
| Related party loan | 69,832,280 | 72,699,779 |
| Due to related party | 4,410,957 | 3,976,742 |
| Income tax payable | 18,050,006 | 18,504,197 |
| Other taxes payable | 2,184,430 | 2,577,102 |
| Convertible notes payable, net of discount | 599,739 | - |
| Derivative liabilities | 267,000 | - |
| Accrued expenses and other payables | 17,682,301 | 15,749,564 |
| Total current liabilities | 1,536,706,539 | 1,148,455,158 |
| | | |
| Deferred tax liabilities | 127,501,207 | 24,218,911 |
| Related party loans | 534,228,724 | 373,327,862 |
| Long term loans | 168,107,252 | 515,477,020 |
| Other long-term liability | 154,098 | - |
| **TOTAL LIABILITIES** | 2,366,697,820 | 2,061,478,951 |
| | | |
| **COMMITMENTS AND CONTINGENCIES** | - | - |
| **SHAREHOLDERS' EQUITY** | | |
| Preferred stock, $0.001 par value, 500,000 shares authorized, none issued or outstanding as of September 30, 2019 and December 31, 2018 | - | - |
| Common stock, $0.001 par value, 100,000,000 shares authorized, 11,018,955 shares issued and outstanding as of September 30, 2019 and December 31, 2018* | 11,019 | 11,019 |
| Additional paid-in capital | 224,420,422 | 224,348,001 |
| Retained earnings | | |
| Unappropriated | 348,178,634 | 353,213,325 |
| Appropriated | 967,543 | 967,543 |
| Accumulated other comprehensive income, net of tax | 379,386,663 | 59,794,859 |
| **Total Shareholders' Equity** | 952,964,281 | 638,334,747 |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $3,319,662,101 | $2,699,813,698 |

139.    The 3Q19 10-Q also provided a table of the Company's inventories, which is reproduced below:

**NOTE 3 – INVENTORIES**

Inventories as of March 31, 2019 and December 31, 2018 consisted of the following:

| | As of | |
|---|---|---|
| | **March 31, 2019** | **December 31, 2018** |
| | *(unaudited)* | |

| | | | | |
|---|---|---:|---|---:|
| Raw materials (A) | $ | 53,960,649 | $ | - |
| Work-in-progress (B) | | 70,719,294 | | 87,160,453 |
| Finished goods (C) | | 39,169,012 | | 39,874,220 |
| Total inventories | $ | 163,848,955 | $ | 127,034,673 |

(A)     Included 1,536,517 grams of Au9999 gold as of March 31, 2019 and Nil Au9999 gold as of December 31, 2018.

(B)     Included 2,020,811 grams of Au9999 gold as of March 31, 2019 and 2,570,232 grams of Au9999 gold as of December 31, 2018.

(C)     Included 1,111,725 grams of Au9999 gold as of March 31, 2019 and 1,168,892 grams of Au9999 gold as of December 31, 2018.

140.     The above-referenced consolidated balance sheet and table of inventories contained in the 3Q19 10-Q were materially false and misleading because they represented the gilded copper alloy bars as genuine gold and failed to disclose that the Company's loans had been secured with counterfeit gold.

### November 18, 2019 Proxy Statement

141.     On November 18, 2019, Kingold filed the 2019 Proxy Statement. Defendants Jia, Wang, Chen, Wu, and Xia solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

142.     With respect to the Code of Ethics, the 2019 Proxy Statement stated that Kingold had "adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting."

143.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, the Individual Defendants' engagement in the Counterfeit

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Collateral Scheme, and the Individual Defendants' failures to report violations of the Code of Ethics.

144.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Individual Defendants improperly engaged in the Counterfeit Collateral Scheme to represent gilded copper alloy bars as genuine gold and thereby fraudulently obtain loans; (2) due to the Company's purported gold being gilded copper bars, the value of the gold assets reported in the Company's financial statements was fraudulently inflated; (3) the Company had been engaged in litigation with various Creditors since at least 2019; (4) due to the foregoing, the Company would foreseeably be subjected to various regulatory consequences, including delisting from the Shanghai Gold Exchange and an investigation by the PRC; and (5) the Company failed to maintain both its internal operational and financial controls. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

145.    On June 1, 2020, Kingold abruptly announced that Defendant Liu would resign from his role as the Company's CFO, effective immediately.

146.    On June 22, 2020, the Shanghai Gold Exchange announced that Kingold's membership had been cancelled due to violation of membership provisions.

147.    Then, on June 29, Caixin Global, a Chinese newspaper and media company known for its investigative journalism published the Caixin Article, which broke the story that Kingold had borrowed more than $2 billion in an assortment of loans collateralized by counterfeited gold bars. The Caixin Article stated the following, in relevant part:

> More than a dozen Chinese financial institutions, mainly trust companies, loaned 20 billion yuan ($2.8 billion) over the past five years to Wuhan Kingold Jewelry Inc. with pure gold as collateral and insurance policies to cover any losses. Kingold is the largest privately owned gold processor in central China's Hubei province. Its shares are listed on the Nasdaq

stock exchange in New York. The company is led by Chairman Jia Zhihong, an intimidating ex-military man who is the controlling shareholder.

What could go wrong?

Well, plenty, **as at least some of 83 tons of gold bars used as loan collateral turned out to be nothing but gilded copper. That has left lenders holding the bag for the remaining 6 billion yuan of loans outstanding against the bogus bars.** The loans were covered by 30 billion yuan of property insurance policies issued by state insurer PICC Property and Casualty Co. Ltd. (PICC P&C) and other smaller insurers.

**The fake gold came to light in February when Dongguan Trust Co. Ltd. set out to liquidate Kingold collateral to cover defaulted debts. In late 2019 Kingold failed to repay investors in several trust products. Dongguan Trust said it discovered that the gleaming gold bars were actually gilded copper alloy.**

**The news sent shockwaves through Kingold's creditors. China Minsheng Trust Co. Ltd., one of Kingold's largest creditors, obtained a court order to test collateral before Kingold's debts came due. On May 22, the test result returned saying the bars sealed in Minsheng Trust's coffers are also copper alloy.**

Authorities are investigating how this happened. Kingold chief Jia flatly denies that anything is wrong with the collateral his company put up.

<p style="text-align:center">*     *     *</p>

In the case of Kingold, the company said it took out loans against gold to supplement its cash holdings, support business operations and expand gold reserves, according to public records. In 2018, the company beat a number of competitors in bidding to buy a controlling stake in stateowned auto parts maker Tri-Ring Group. Kingold offered 7 billion yuan in cash for 99.97% of TriRing. The Hubei government cited the deal as a model of so-called mixed-ownership reform, which seeks to invite private shareholders into state-owned enterprises. But Kingold has faced problems taking over Tri-Ring's assets amid a series of corruption probes and disputes involving Tri-Ring. After obtaining the test results, Minsheng Trust executive said the company asked Jia whether the company fabricated the gold bars. "He flatly denied it and said it was because some of the gold the company acquired in early days had low purity," the executive said. In a telephone interview with Caixin in early June, Jia denied that the gold pledged by his company was faked. "How could it be fake if insurance companies agreed to cover it?" he said and refused to comment further.

**As of early June, Minsheng Trust, Dongguan Trust and a smaller creditor Chang'An Trust filed lawsuits against Kingold and demanded that PICC P&C cover their losses.** PICC P&C declined to comment to Caixin on the matter but said the case is in judicial procedure.

A source from PICC P&C told Caixin that the claim procedure should be initiated by Kingold as the insured party rather than financial institutions as beneficiaries. Kingold hasn't made a claim, the source said.

Caixin learned that *the Hubei provincial government set up a special task force to oversee the matter* and that *the public security department launched an investigation. The Shanghai Gold Exchange, a gold industry self-regulatory organization, disqualified Kingold as a member* June 24.

All that glitters is not gold

*Following Dongguan Trust and Minsheng Trust, two other Kingold creditors also tested pledged gold bars and found they were fake*, Caixin learned. A Dongguan Trust employee said his company reported the case to police Feb. 27, the day after the Hubei branch. Kingold has defaulted on 1.8 billion yuan of loans from Dongguan Trust with an additional 1.6 billion yuan due in July. The 83 tons of purportedly pure gold stored in creditors' coffers by Kingold as of June, backing the 16 billion yuan of loans, would be equivalent to 22% of China's annual gold production and 4.2% of the state gold reserve as of 2019. Founded in 2002 by Jia, Kingold was previously a gold factory in Hubei affiliated with the People's Bank of China that was split off from the central bank during a restructuring. With businesses ranging from gold jewelry design, manufacturing and trading, Kingold is one of China's largest gold jewelry manufacturers, according to the company website. The company debuted on Nasdaq in 2010. The stock currently trades around $1 apiece, giving Kingold a market value of $12 million, down 70% from a year ago. A company financial report showed that Kingold had $3.3 billion of total assets as of the end of September 2019, with liabilities of $2.4 billion. Jia, now 59, served in the military in Wuhan and Guangzhou and spent six years living in Hong Kong. He once managed gold mines owned by the People's Liberation Army.

\*       \*       \*

Several trust company sources said Jia is well connected in Hubei, which may explain Kingold's surprise victory in the Tri-Ring deal. *But a financial industry source in Hubei said Jia's business is not as solid as it may appear.*

*"We knew for years that he doesn't have much gold — all he has is copper," said the source, who declined to be named.*

Local financial institutions in Hubei have avoided doing business with Kingold, but they don't want to offend him publicly, the source said.

"Almost none of Hubei's local trust companies and banks has been involved in (Kingold's) financing," he said.

Public records showed that most of Kingold's creditors are from outside Hubei. Caixin learned from regulatory sources that Minsheng Trust is the largest creditor of Kingold with nearly 4.1 billion yuan of outstanding loans, followed by [Evergrowing] Bank's 3.9 billion yuan, Dongguan Trust's 3.4 billion yuan, Anxin Trust & Investment Co.'s 1.9 billion yuan and Sichuan Trust Co.'s 1.8 billion yuan.

Several industry sources told Caixin that the institutions were willing to offer loans to Kingold because Jia promised to help them dispose of bad loans. [Evergrowing] Bank is the only commercial bank involved in the Kingold affair. The bank in 2017 provided an 8

billion yuan loan to Kingold, which in return agreed to help the bank write off 500 million yuan of bad loans, bank sources said. Kingold repaid half of the debts in 2018.

***But the loan issuance involved many irregularities as access to the pledged gold and testing procedures was controlled by Kingold***, one [Evergrowing] employee said. The loan was pushed forward by Song Hao, former head of [Evergrowing]'s Yantai branch. Song was placed under graft investigation in March 2018 in connection with the bank's disgraced former Chairman Cai Guohua, whose downfall led to a major revamp in the bank's management. ***In 2019, [Evergrowing]'s new management sued Kingold for the unpaid loans and moved to dispose the collateral. But a test of the gold bars found they are "all copper,"*** the bank source said. It is still unclear whether the collateral was faked in the first place or replaced afterward. Sources from Minsheng Trust and Dongguan Trust confirmed that the collateral was examined by third-party testing institutions and strictly monitored by representatives from Kingold, lenders and insurers during the process of delivery. "I still can't understand which part went wrong," a Minsheng Trust source said. Bank records showed that the vault where the collateral was stored was never opened, the source said.

<p align="center">*       *       *</p>

***Since 2015, Kingold has increased its reliance on gold-backed borrowing and started working with PICC P&C to cover the loans. In 2016, Kingold borrowed 11 billion yuan, nearly 16 times higher than the previous year's figure. Its debt-to asset ratio surged to 87.5% from 43.4%, according to a company financial report. That year, Kingold pledged 54.7 tons of gold for loans, 7.5 times higher than the previous year.***

A person close to Jia said the surge of borrowing was partly due to Kingold's pursuit of Tri-Ring... The deal drew immediate controversy as some rival bidders questioned the transparency of the bidding process and Kingold's qualifications. According to Kingold's financial reports, the company had only 100 million yuan of net assets in 2016 and 2 billion yuan in 2017, sparking doubts over its capacity to pay for the deal.

Despite the fuss, Kingold paid 2.8 billion yuan for the first installment shortly after the announcement of the deal. The second installment of 2.4 billion yuan was paid several months later with funds raised from Dongguan Trust.

In December, Tri-Ring completed its business registration change, marking completion of Kingold's takeover. However, the new owner has since faced troubles mobilizing Tri-Ring's assets because of a series of corruption probes surrounding the auto parts maker since early 2019 that brought down TriRing's former chairman.

A major part of Tri-Ring's assets were frozen amid the investigation and subsequent debt disputes, limiting Jia's access to the assets.

Hobbled by the Tri-Ring deal, which cost billions of yuan but has yet to make any return, Jia's capital chain was eventually broken when [Evergrowing] Bank pushed for repayment, triggering a series of events that brought the fake gold to light, said a person close to the matter.

<p align="center">*       *       *</p>

Insurers' involvement was key to the success of Kingold's gold-backed loan deals. The insurance policies provided by leading state-owned insurers like PICC P&C were a major factor defusing lenders' risk concerns, several trust company sources said. "Without the insurance coverage from PICC P&C, (we) wouldn't issue loans to Kingold as the collateral can only be tested through random picked samples," one person said. PICC P&C's Hubei branch provided coverage for most of Kingold's loans, Caixin learned. All the policies will expire by October. As of June 11, 60 policies were still valid or involved in lawsuits.

(Emphasis added.)

148.    The Caixin Article also indicated that the Individual Defendants may have colluded

with individuals in leadership positions at certain of the Creditors in order to carry out the

Counterfeit Collateral Scheme, stating:

[T]he loan issuance [from Evergrowing to Kingold] involved many irregularities as access to the pledged gold and testing procedures was controlled by Kingold, one [Evergrowing] employee said. The loan was pushed forward by Song Hao, former head of [Evergrowing]'s Yantai branch. Song was placed under graft investigation in March 2018 in connection with the bank's disgraced former Chairman Cai Guohua, whose downfall led to a major revamp in the bank's management.

*        *        *

A financial regulatory official told Caixin that *previous investigations of loan fraud cases involving fake gold pledges found there was often collusion between borrowers and financial institutions.*

Earlier this year, PICC P&C removed its Hubei branch party head and general manager Liu Fangming. *Sources said staff members involved in business with Kingold were also dismissed.*

*PICC P&C said Liu [Fangming]'s removal was due to internal management issues. It didn't answer Caixin's question about whether Liu [Fangming] was involved in the Kingold scandal.*

(Emphasis added.)

149.    On this news, Kingold stock dropped by more than 24%, or $0.27, from $1.12 per

share at the close of trading on June 26, 2020, the prior trading day, to $0.85 per share at the close

of trading on June 29, 2020.

150.    On July 6, 2020, Kingold filed the July 6, 2020 8-K, which disclosed that the

Company had "received various notices of default on a number of loans with seven lenders. The

loans are all secured by gold assets in the control of the lenders, the adequacy and integrity of which are under dispute," and that "[t]he aggregate amount of loans for which Wuhan Kingold has received notices of default is approximately RMB 10 billion," or approximately $1,430.8 million at the current exchange rate of 1 RMB:0.14 USD.

151.    The July 6, 2020 8-K also revealed that in February 2020, Anxin had filed a lawsuit against Wuhan Kingold in connection with a dispute over the gold-backed loans Anxin had disbursed to Kingold.

152.    The July 6, 2020 8-K indicated that Defendants Chen and Wu had been appointed to a special committee to investigate the allegations described herein, and that Defendants Chen and Wu were empowered to hire independent advisors in connection with the investigation.

153.    Lastly, on July 14, 2020, the Company filed a current report on Form 8-K (the "July 14, 2020 8-K") disclosing details regarding the Anxin lawsuit, the existence of which had been initially disclosed in the July 6, 2020 8-K. The July 14, 2020 8-K disclosed the following additional details:

> **Anxin Litigation Update.** As previously disclosed, in February 2020, Anxin Trust Co., Ltd. ("Anxin Trust") filed a lawsuit against Wuhan Kingold and the Company's CEO in connection with the loan dispute arising from the loan agreement Wuhan Kingold entered into with Anxin Trust on January 29, 2016, and related extension and supplemental agreements. In April 2020, the plaintiff amended its complaint to add an additional defendant, Wuhan Kingold Industrial Group Co., Ltd, a related party to the Company, to the case and to change the outstanding balance of the due and payable amount under the loan from approximately RMB 0.39 billion in interest to a total of approximately RMB 2.3 billion including approximately RMB 2.0 billion of loan principal. This loan dispute suit is pending with the Shanghai Financial Court (the "Financial Court"). To preserve the defendants' assets pending the outcome of the trial, ***in May 2020, the Financial Court issued a ruling and ordered to freeze the defendants' assets of an aggregate value of approximately RMB 1.9 billion, including bank deposits, real property or personal property.*** At present, the parties' suit regarding venue change is pending with the Shanghai High People's Court and no hearing has been scheduled as of the date of this report.

(Emphasis added.)

154.    The July 14, 2020 8-K further disclosed that the Company had failed to file its 1Q20

10-Q before its due date. The Company would, at that time, have been required to disclose Anxin's

lawsuit against the Company and any other litigation with Lenders which may have been pending.

The July 14, 2020 8-K also disclosed that the special committee announced in the July 6, 2020 8-

K was unable to retain advisors due to the Company's bank accounts being frozen.

155.    On August 11, 2020, the Company filed a current report on Form 8-K indicating

that the Company had notified NASDAQ authorities of the Company's intention to voluntarily

delist its common stock from NASDAQ. The Form 8-K stated, among other things, that "[t]he

decision to delist from NASDAQ resulted from the Board of Directors' review of numerous

factors, particularly the cost and feasibility of ongoing compliance with the NASDAQ listing

requirements and the Company's current financial condition."

156.    On August 15, 2020, Friedman sent Kingold a letter indicating that the firm had

resigned as the Company's independent registered public accounting firm, effective immediately.

In its resignation letter, which the Company included as an exhibit to a current report on Form 8-

K filed with the SEC on August 20, 2020, Friedman stated the following, in relevant part:

> This letter serves as notification that we have become aware of information which
> relates to Kingold Jewelry, Inc.'s ("the Company") financial statements for the
> years ended December 31, 2016, December 31, 2017 and December 31, 2018 ("the
> financial statements"), which was not known to Friedman at the date of our audit
> reports relating to the financial statements, and which is of such a nature and from
> such a source that we would have investigated the information had it come to our
> attention during the course of the audits relating to the financial statements. **The
> Company has not cooperated in attempting to substantiate this information and,
> as a result, Friedman is unable to conduct a satisfactory investigation of the
> information. Accordingly, Friedman's audit reports on the financial statements
> should no longer be relied upon or associated with the financial statements.**
>
> *            *            *
>
> This letter also serves as notification of Friedman's resignation as the Company's
> independent registered public accounting firm. Consistent with the terms of our
> engagement letter, we have elected to withdraw from this engagement because, in

our judgment, ***we are unable to obtain reasonable assurance about the financial statements as would be required to issue an unmodified audit opinion***. We also confirm that the client-auditor relationship between the Company and Friedman LLP has ceased.

(Emphasis added.)

157.    On August 31, 2020, the Company's stock was delisted from NASDAQ, and began trading on the OTC.

### The Company's Delinquent Filings

158.    Throughout its history as a publicly-traded company, Kingold's management have frequently failed to timely file the Company's required quarterly and annual reports with the SEC, and have consistently availed themselves of the SEC's as-of-right extension to file past the deadline without penalty. For instance, the 2017 10-K, the 3Q18 10-Q, the 2018 10-K, and the 1Q19 10-Q were each submitted past the ordinary deadline, but before the extended deadline.

159.    On June 30, 2020, the Company was notified by NASDAQ that it was in violation of the requirements of NASDAQ Listing Rule 5250(c)(1) for continued listing on the NASDAQ because the Individual Defendants had failed to timely file with the SEC the Company's 1Q20 10-Q. NASDAQ further stated that the Company had until August 29, 2020 to either file its 1Q20 10-Q or submit a plan to do so. As of the date of the filing of this complaint, however, the Individual Defendants have yet to file the Company's 1Q20 10-Q.

160.    On July 2, 2020, the Company was notified by NASDAQ that it was in further violation of NASDAQ Listing Rule 5250(c)(1) because the Individual Defendants had failed to timely file with the SEC the Company's 2019 10-K. NASDAQ further stated that, pursuant to NASDAQ's discretionary authority set forth in Listing Rule 5101, it was accelerating the deadline to file or submit a plan to do so. NASDAQ granted Kingold until July 16, 2020 to submit a plan

to regain compliance. Yet, the Individual Defendants missed this deadline as well, and as of the date of the filing of this complaint, the Individual Defendants have yet to file the 2019 10-K.

161.     The fact that the Individual Defendants have failed to file the Company's required annual and periodic reports with the SEC for more than half a year—let alone the fact that the Individual Defendants made materially false statements in the Company's SEC filings and continued to do so even after their fraudulent conduct was exposed in the news media—gives rise to the inference that the Individual Defendants have abandoned the Company in order to serve their own interests to the detriment of Kingold and its shareholders.

## DAMAGES TO KINGOLD

162.     As a direct and proximate result of the Individual Defendants' misconduct, Kingold will lose and expend many millions of dollars.

163.     Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Actions filed against the Company, its CEO, and its former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, as well as punitive amounts levied by Chinese governmental authorities and/or other parties in connection with the freeze on Kingold's bank accounts.

164.     Such expenditures also include legal fees associated with the various Creditors' lawsuits involving the Company, including the lawsuits filed by Evergrowing and Anxin, as well as any fees associated with the PRC's investigation of the Company.

165.     Such expenditures also include, but are not limited to, compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

166.     Such losses include the Company's delisting from NASDAQ and from the Shanghai Gold Exchange.

167.    As a direct and proximate result of the Individual Defendants' conduct, Kingold has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

168.    Plaintiff brings this action derivatively and for the benefit of Kingold to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Kingold and unjust enrichment, as well as the aiding and abetting thereof.

169.    Kingold is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

170.    Plaintiff is, and has been since the beginning of the Relevant Period, a Kingold shareholder. Plaintiff will adequately and fairly represent the interests of Kingold in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

171.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

172.    A pre-suit demand on the Board of Kingold is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Jia, Chen, Wang, Wu, and Xia (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

173.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their knowing or reckless engagement in the Counterfeit Collateral Scheme and in the scheme to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

174.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the Counterfeit Collateral Scheme and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

175.    Additional reasons that demand on Defendant Jia is futile follow. Defendant Jia is the Company's founder, and has served as the Company's CEO and Chairman of the Board since 2009. Thus, as the Company admits, he is a non-independent director. Defendant Jia has received and continues to receive compensation for his roles with the Company as described herein. As of November 14, 2019, Defendant Jia owned approximately 25.5% of the Company's outstanding shares, making him a majority shareholder. Additionally, Defendant Jia and, in some instances, his spouse personally guaranteed all the loans that are at issue as described herein. Defendant Jia was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Counterfeit Collateral Scheme and in the scheme to make

false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Jia is a defendant in the Securities Class Actions. For these reasons, Defendant Jia breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Wang is futile follow. Defendant Wang has served as a Company director and as the Company's General Manager since 2014. Defendant Wang has received and continues to receive compensation for his role as General Manager as described above. As a trusted Company officer and director, he conducted little, if any, oversight of the Company's engagement in the Counterfeit Collateral Scheme and in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Wang signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Wang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Chen is futile follow. Defendant Chen has served as a Company director since June 2014, and serves as Chair of the Nominating Committee and as a member of the Audit Committee and Compensation Committee. Defendant Chen has received and continues to receive compensation for his role on the Board as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Counterfeit Collateral Scheme and in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chen signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Chen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Wu is futile follow. Defendant Wu has served as a Company director since May 2016, and serves as Chair of the Audit Committee and as a member of the Nominating Committee and Compensation Committee. Defendant Wu has received and continues to receive compensation for her role on the Board as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the Counterfeit Collateral Scheme and in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Wu signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Wu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Xia is futile follow. Defendant Xia has served as a Company director since August 2016, and serves as Chair of the Compensation Committee and as a member of the Audit Committee and Nominating Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Counterfeit Collateral Scheme and in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the

scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Xia signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Xia breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on the Board is futile follow.

181.    Demand is excused in this case because the Directors, all of whom are named as defendants in this action, are beholden to and controlled by Defendant Jia, whose beneficial share ownership provided him with approximately 25.6% of total shareholder voting power as of November 14, 2019. These shareholdings provide Defendant Jia with significant control over the election of the Directors, and especially over Defendant Wang, who serves as the Company's General Manager in addition to serving as a Company director. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Jia's control over them.

182.    Defendants Chen, Wu, and Xia (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

183.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Counterfeit Collateral Scheme and in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

184.    Kingold has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Kingold any part of the damages Kingold suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

185.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

186.    The acts complained of herein constitute violations of fiduciary duties owed by Kingold's officers and directors, and these acts are incapable of ratification.

187.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Kingold. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Kingold, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

188.     If there is no directors' and officers' liability insurance, then the Directors will not cause Kingold to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

189.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Individual Defendants for Violations of**
**Section 14(a) of the Exchange Act**

190.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

64

191.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

192.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

193.    Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose, *inter alia*, that: (1) the Individual Defendants improperly engaged in the Counterfeit Collateral Scheme to represent gilded copper alloy bars as genuine gold and thereby fraudulently obtain loans; (2) due to the Company's purported gold being gilded copper bars, the value of the gold assets reported in the Company's financial statements was fraudulently inflated; (3) the foregoing misconduct would foreseeably subject the Company to litigation with various Creditors and to various regulatory consequences, including delisting from the Shanghai Gold Exchange and an investigation by the PRC; and (4) the Company failed to maintain both its internal operational and financial controls. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.

194.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the Individual Defendants improperly engaged in the Counterfeit Collateral Scheme to represent gilded copper alloy bars as genuine gold and thereby fraudulently obtain loans; (2) due to the Company's purported gold being gilded copper bars, the value of the gold assets reported in the Company's financial statements was fraudulently inflated; (3) the Company had been engaged in litigation with various Creditors since at least 2019; (4) due to the foregoing, the Company would foreseeably be subjected to various regulatory consequences, including delisting from the Shanghai Gold Exchange and an investigation by the PRC; and (5) the Company failed to maintain both its internal operational and financial controls. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.

195.    Moreover, the 2018 and 2019 Proxy Statements (the "Proxy Statements") were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the Counterfeit Collateral Scheme and in the scheme to issue false and misleading statements and omissions of material fact.

196.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and advisory approval of officer compensation.

197.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Jia, Wang, Chen, Wu, and Xia, which allowed them to continue breaching their fiduciary duties to Kingold.

198.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

199.    Plaintiff on behalf of Kingold has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

200.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Kingold's business and affairs.

202.    Each of the Individual Defendants violated and breached fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

203.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Kingold.

204.    In breach of their fiduciary duties owed to Kingold, the Individual Defendants willfully or recklessly caused the Company to engage in the Counterfeit Collateral Scheme and to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that (1) the Individual Defendants improperly engaged in the Counterfeit Collateral Scheme to represent gilded copper alloy bars as genuine gold and thereby fraudulently obtain loans; (2)

due to the Company's purported gold being gilded copper bars, the value of the gold assets reported in the Company's financial statements was fraudulently inflated; (3) the Company had been engaged in litigation with various Creditors since at least 2019; (4) due to the foregoing, the Company would foreseeably be subjected to various regulatory consequences, including delisting from the Shanghai Gold Exchange and an investigation by the PRC; and (5) the Company failed to maintain both its internal operational and financial controls. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.

205.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

206.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls over operations or financial reporting and failed to timely file the 1Q20 10-Q and the 2019 10-K with the SEC.

207.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Kingold's securities.

208.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Kingold's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

209.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

210.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kingold has sustained and continues to sustain significant damages.

211.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

212.    Plaintiff on behalf of Kingold has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Kingold.

215.    The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received

bonuses, stock options, or similar compensation from Kingold that was tied to the performance or artificially inflated valuation of Kingold, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

216.    Plaintiff, as a shareholder and a representative of Kingold, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

217.    Plaintiff on behalf of Kingold has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Kingold, for which they are legally responsible.

220.    As a direct and proximate result of the Individual Defendants' abuse of control, Kingold has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Kingold has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

221.    Plaintiff on behalf of Kingold has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

222.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Kingold in a manner consistent with the operations of a publicly-held corporation.

224.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Kingold has sustained and will continue to sustain significant damages.

225.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

226.     Plaintiff on behalf of Kingold has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

227.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.     The Individual Defendants caused the Company to pay themselves excessive compensation to the detriment of the shareholders and the Company.

229.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Kingold to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

230.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

231.    Plaintiff on behalf of Kingold has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Kingold, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Kingold;

(c)     Determining and awarding to Kingold the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Kingold and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kingold and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Kingold to nominate at least

three candidates for election to the Board; and

        3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)     Awarding Kingold restitution from Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: September 8, 2020             Respectfully submitted,

                        **THE BROWN LAW FIRM, P.C.**

                        */s/ Timothy Brown*_____
                        Timothy Brown
                        240 Townsend Square
                        Oyster Bay, NY 11771
                        Telephone: (516) 922-5427
                        Facsimile: (516) 344-6204
                        Email: tbrown@thebrownlawfirm.net

                        *Counsel for Plaintiff*

## **VERIFICATION**

I, Jacob Thundathil am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _9/8/2020_____, 2020.

DocuSigned by:

*Abraham Jacob Thundathil*

FC14818A8297438...

Jacob Thundathil